**NATIONAL CAMPAIGN COMMITTEE et al.
v. ROGAN.
Civ. No. 1219.**

District Court, S. D. California,
Central Division.

Jan. 24, 1945.

680

John J. Irwin, of Los Angeles, Cal., for plaintiff.

Charles H. Carr, U. S. Atty., and E. H. Mitchell, Asst. U. S. Atty., both of Los Angeles, Cal., for defendant.

HALL, District Judge.

The first question to be determined is whether or not the plaintiffs are exempted completely from the Social Security Act and from the payment of Social Security taxes under the provisions of Section 811 (b) (8) of the Act as it stood before the amendments of August 10, 1939, 42 U.S. C.A. § 1011(b) (8), which amendments did not become effective until January 1, 1940, which date was subsequent to the period here involved.

That section was included in the Act as originally adopted August 14, 1935, and until the amendment above referred to read as follows: "The term 'employment' means any service, of whatever nature, performed within the United States by an employee for his employer, except— (8) service performed in the employ of a corporation, community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual."

The government makes the point that interpretations of similar exemption provisions in the Internal Revenue Acts should control here. A reading of Subdivision 8 in that connection discloses that the language was identical with a comparable exemption provision in the Internal Revenue Acts from 1931 to 1932, the respective sections being 231(6) of the Internal Revenue Acts of 1921 and 1924 and 1926, 42 Stat. 227, 26 U.S.C.A. Int.Rev.Acts, pages 38, 183, and Section 103(6) of the Internal Revenue Acts of 1928 and 1932, 26 U.S.C.A. Int.Rev. Acts, pages 372, 507.

In 1934, however, apparently in view of conflicting decisions of the courts, a limiting and qualifying phrase was added to the Internal Revenue statute which becomes significant herein, as will appear. That phrase, thus added to this subdivision of the Internal Revenue Act on May 10, 1934, § 101(6), 26 U.S.C.A.Int.Rev.Acts, page 688, reads as follows, and it is added at the end, a period after the word "individual" being displaced by a comma, in the following language: "* * * and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation."

So that the whole section of the subdivision in the Internal Revenue Acts, omitting the words "service performed", refers to "corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation."

So that the comparable provision in the Internal Revenue Act on the date of the enactment of the Social Security Act on August 14, 1935 (almost one year after the Internal Revenue Act was amended) read as I have just quoted it.

In enacting the Social Security Act that qualifying phrase as previously added to the Internal Revenue Act in 1934 was omitted. Unless the District Courts are to accept as fiat without question, the interpretation, put on acts of Congress by the so-called experts who administer those laws, the omission of that clause, under long established rules of statutory construction, must be given some significance, and the significance is that Congress did not intend that the limitation which they placed in the Internal Revenue Act should apply to the Social Security Act; that is to say, that an educational purpose could include an attempt to influence legislation.

The significance of the omission is heightened by the fact that the Social Security Act was not a hastily or haphazardly conceived and drawn piece of legislation. As indicated by the Committee reports, House Report 615 and Senate Report 628 of the Seventy-Fourth Congress, the Committee on Economic Security, composed of the Secretaries of Labor, Treasury, Agriculture, the Attorney General, and the Federal Relief Administrator, devoted six months to a study of the subject, assisted by a staff of specialists and fourteen advisory groups. I am not warranted in indulging the incredulous presumption that such a group of experts made such an omission without purpose, especially so in view of the omission in the Social Security Act of many other categories which were exempted in the Internal Revenue laws. The exemptions under the comparable provision in the Internal Revenue laws include eighteen different categories of exemption classifications, whereas the comparable provision in the Social Security Act covered only eight categories.

House Report No. 615 of the Seventy-Fourth Congress contained the following language: "Exemption from taxation under this title is also granted in the case of federal, state, or political subdivision employees. Services performed in the employ of religious, charitable, scientific, literary, or educational institutions, no part of the net earnings of which inures to the benefit of any private shareholder or individual, are also exempt from the tax imposed by this title. For the purpose of determining whether such an organization is exempt, the use to which the income is applied is the ultimate test of the exemption rather than the source from which the income is derived. For instance, if a church owns an apartment building from which it derives income which is devoted to religious, charitable, educational, or scientific purposes, it will not be denied the exemption. The organizations which will be exempt from such taxes are churches, schools, colleges, and other educational institutions not operated for private profit, the Y.M.C.A., the Y.W.C.A., the Y.M.H.A., the Salvation Army, and other organizations which are exempt from income tax under Section 101(6) of the Revenue Act of 1932 [1934]."

The government's contention that thus Congress intended the same meaning in the Social Security Act as under Section 101 (6) of the Internal Revenue law must be rejected because Congress did not use the same language in Subdivision 811(b) (6) as it did in 101(6), and a mere reading of the comparable sections as above indicated shows that in the Internal Revenue Act there were eighteen different classifications of exemptions, whereas there were only eight in the Social Security Act, as I have indicated.

That this omission had a meaning and was deliberate is further indicated by the fact that on August 10, 1939, effective January 1, 26 U.S.C.A.Int.Rev.Code, § 1426, the identical language of limitation, the last clause I read at the beginning of these remarks, was added to Subdivision 8 of the Social Security Act. Moreover, in the meanwhile the Internal Revenue Code was adopted on February 10, 1939, at which time Congress did not add the limiting clause to Subdivision 8 of the Social Security Act.

It is argued that the amendment was a "clarifying" amendment and added nothing to the meaning of the Act. If it added nothing to the meaning of the Act, there was no need for clarifying the law.

Furthermore, while committee reports cannot be taken as the token of the intention which exists in the minds of each or all of the very numerous members of both houses of Congress who might vote for a

bill, for one reason or another, and not necessarily the reasons stated in the committee report, nevertheless, House Report 728 and Senate Report 734 of the Seventy-Sixth Congress which were filed on the amendment in 1939, indicate that after three years of "intensive study" by the Social Security Board the amendments were offered "to strengthen and extend" the Social Security Act. This is borne out by even a casual examination of the amendments of 1939 and as well by the reports of the committee on the original bill which indicated that its sponsors expected only about half of the employed people in the United States to be covered by the provisions. The figures which are set forth in the reports on the original bill, House Report 615 of the Seventy-Fourth Congress, show that they estimated 48,830,000 people gainfully employed, while the Act was planned to cover only 25,804,000, leaving 23,000,000, or almost half of the employed people, not to be covered.

■ Hence, I am not justified in extending the Act beyond the words which are contained in the Act itself, on the theory that, it being a remedial statute, it must be extended to cover every conceivable classification which might carry out a plan or the hope of Social Security.

■ I conclude, therefore, that the Act as it stood during the period under litigation did not prevent exemption of an association as an educational organization which sought to influence legislation.

■ The government contends, however, because some of the moneys collected by the plaintiffs were paid to the Cinema Advertising Company, that such moneys inure to the benefit of the Allen brothers as individuals, and thus the plaintiffs are excluded from exemption under the clause which denies exemption if any part of the net earnings inures to the benefit of any private shareholder or individual. Compared to the total receipts in the two campaigns, which were well in excess of $1,000,000 taken in by the plaintiffs, that is, the organization, the amounts received by the Allen brothers were trivial. Moreover, the money paid to the Cinema Advertising Company, a previously established and going business, was paid for services actually rendered at the going and usual rates charged in this community by similar businesses. Certainly the evidence is overwhelming that the plaintiffs' funds were used to further the purposes of the organization and not to line the pockets of any individual or group of individuals, and in simple justice to the plaintiffs, it must be said that there was an unusual fidelity of purpose and zeal for their cause and indefatigable work which almost amounted to an evangelism for the cause.

■ But the percentage of money going to any individual is not the test of the statute. The test is whether or not such money was "net earnings." In view of the fact that the various income tax and revenue laws use terms such as "income," "profits," "proceeds," all of which have legal significance, it must be concluded that the term "net earnings" means just what it says, not income, not gross proceeds, and not profits, but "net earnings."

Obviously, the use of the word "earnings" was not intended to be so broad as to cover income, because every organization, whether a Community Chest Fund, foundation, church, Salvation Army, or what not, has to have individuals run it, and to adopt the construction contended for by the government would prevent the payment of any money to any individual, because the language of the statute says that no part of the net earnings shall go to an individual, whether that individual is a member or stockholder or not. It would also prevent any individual, who might be so employed or might be receiving reimbursement for his or her expenses, from either making a contribution to the charitable cause or whatever it was or other exempted organization, or from becoming a member, for instance, of a particular church.

There can be little doubt that what Congress intended was to prevent evasion of the tax by such an organization being set up as an ostensible charity, but the true purpose of which would be to produce earnings for the person or persons who set it up, but all the evidence in this case taken together shows no such purpose of

evasion on the part of the plaintiffs here or any of its thousands of members who participated in the activities of the plaintiff.

While there is some evidence that the plaintiffs received some money from the sale of advertising in their paper, or from the sale of literature, and even from a circus for awhile, it was comparatively small compared to the total intake, and there is no evidence to show that any of the money was either "earnings" or "net earnings."

■ I must conclude from all of the evidence on this point against the contention of the government and hold that there were no net earnings and, in fact, hold that there were no earnings and, hence, there could be and were no net earnings which would inure to the benefit of any private individual.

That still does not dispose of the point of exemption under this subdivision of the statute. It must be noted that to be exempt under the provisions of the statute as it stood at all times since its enactment, the organization must have been organized and operated exclusively for the educational purpose.

While I hold that, under the law, influencing the voters of the state on a statewide election on an initiative measure such as the one here involved, as well as bringing home to the officials the need for some financial security to the people, generally was an educational purpose, nevertheless, under the evidence I am constrained to hold that it was not the exclusive purpose of the organization.

This is so because the organization, in addition to the initiative measures in 1938 and in 1939, in both of those years endorsed and supported candidates for public office, either existing or to be created, and in 1938 opposed and worked against other officers. Moreover, the measure itself, as submitted in 1938, named three men, one of whom was required to be appointed as administrator of the measure if it passed, and the measure submitted in 1939 named two persons, one of whom by adoption of the measure was mandatorily required to be designated as administrator by the govern-

or, subject only to such designee's acceptance.

The measures on their face would vest tremendous powers, almost dictatorial powers, over the economic life of California and its people in such administrators, so much so that the campaign for the measure was just as much a campaign for the designated administrators, and the evidence shows that in educating the people on the merits of the measure the plaintiffs likewise publicized the virtues of the designees who were actually candidates for public offices to be created by the act, and they were the only candidates who could be appointed for that office with no choice, at that election upon that measure, to the people to vote upon, or even indirectly through the Governor select, any other person or persons.

That the activities of the plaintiffs during this period were not limited to the education of the public and officials on the merits of the measure is indicated, for instance, by Exhibit NN, wherein it is boasted that their votes "washed up" certain candidates in 1938. And in 1938, the evidence shows that candidates for various public offices were supported and others were vigorously condemned in the whole activities of the organization.

While the activities of the plaintiffs in connection with the various persons was no doubt prudent from the viewpoint of securing people in office friendly to their cause, nevertheless I cannot read the Act as meaning to exempt activities telling of the qualifications and merits and demerits of persons as contrasted with the merits or demerits of principles which might be embodied in legislation. This distinction is so apparent to me as to need no elaboration other than to say that to permit candidacies of persons to come within the umbrella of exemption would be to completely destroy the statute and destroy the distinction, which is fundamental in our law, between rules of conduct for the government of people and for the governance of government officials, and the exaltation merely of any person.

■ I must conclude, therefore, from all of the evidence that the plaintiffs were not

organized and operated exclusively for educational purposes so as to bring them within the exemption of Section 811(b) (8) of the Social Security Act.

It will be necessary to pass upon a point not too clearly made or presented by the plaintiffs but which, if correct, would exempt them from the tax. Incidentally, it is a point which has given me considerable study. The point is that placing the propositions on the ballot by the initiative petitions for adoption or rejection by vote of the people of the State of California and the campaigns in support of these measures was an exercise of the legislative function of the State of California, and as such was just as exempt from Social Security taxes as, for instance, the money received from and paid by the State to a member of the legislature of the State of California. Article 4, Section 1, of the California Constitution, which is the appropriate section, reads as follows:

"Article IV. Legislative Department

"Section 1. The legislative power of this state shall be vested in a Senate and Assembly which shall be designated 'The Legislature of the State of California,' but the people reserve to themselves the power to propose laws and amendments to the Constitution, and to adopt or reject the same, at the polls independent of the Legislature, and also reserve the power at their own option to so adopt or reject any act, or section or part of any act, passed by the Legislature."

The whole section and clause is too long to read at this time, but that is sufficient to indicate that in the State of California the people themselves are an integral part of its legislative system.

Now, the pertinent provision of the Social Security Act is Section 811(b) (7), 42 U.S.C.A. § 1011(b) (7), and it exempts services performed in the employ of a state, a political subdivision thereof, or an instrumentality of one or more states or political subdivisions.

The right of the people to legislate under Article 4 has been freely used since the 1912 constitutional amendment which has permitted it. I have taken judicial notice of the public records in that respect, and upon compilation it is disclosed that 377 different state propositions have been submitted since 1912 to the people of the State of California.

In addition to the 377 statewide propositions, there have been hundreds of matters submitted by cities, counties, and other political subdivisions, so that in a very real sense this right of the people to legislate has been a governmental function. But the education of the people as to the merits or demerits of a particular measure is not, as I see it, a governmental function. In fact, the very essence of the initiative and referendum is that the people in their own fashion may legislate *without* the intervention of the state or any of the state's functionaries.

Furthermore, the exemption of Section 811(b) (7) of the Social Security Act indicates that for the exemption to attach there must be employment, that is, control by the state in the relation of employer and employee; that is to say, there must be employment before the exemption attaches; but there is clearly no control or direction even in the slightest degree by the State of California or any of its officers, agencies, or functionaries of any kind of the plaintiffs here, and I must conclude on that point against the plaintiffs.

The remaining point upon which the plaintiffs rely is that no relationship of employer and employee existed between the plaintiffs and those who were engaged in the campaign. The statute says, 811(b), and I am omitting some words to get the sense of this: "The term 'employment' means any service * * * performed * * * by an employee for his employer."

Thus, if there was no employment, then no tax was due, whether there was specific exemption or not.

The regulations promulgated by the Commissioner of Internal Revenue under the Act with relation to Section 811(b), and the definition of the term "employment" provided as follows, and this is Article 2, page 3, of a pamphlet which is designated as "Regulation 91, Relating to the Employees' Tax and Employers' Tax under Title VIII, Social Security Act, Washington, 1936, Price 10 cents."

"To constitute an employment the legal relationship of employer and employee must exist between the person for whom the services are performed and the individual who performs them."

Article 3 on the same page of the same pamphlet reads in part: "The relationship between the person for whom such services are performed and the individual who performs such services must as to those services be the legal relationship of employer and employee. Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work, but also as to the details and the means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection it is not necessary that the employer actually direct or control the manner in which the services are rendered. It is sufficient if he has a right so to do."

The section is longer but that is the pertinent provision. These are the commonly accepted legal elements of the relationship of employer and employee.

The plaintiffs make the point that the Superior Court of the State of California, in an action wherein the judgment has become final, decided that such relationship did not exist. And that under the doctrine of Fidelity Union v. Field, 311 U.S. 169, 61 S.Ct. 176, 85 L.Ed. 109, and other cases which they cited, such judgment must be accepted here.

▮▮▮▮▮ While the finality of that decision may be, and no doubt is, sufficient to control in the interpretation of the state's Minimum Wage and Social Security laws, it does not follow that it must control in the interpretation of a federal statute which cannot be subject in its national administration to the hazards of varying definitions of employer and employee which the various forty-eight states might choose to adopt and might develop for their own laws. And, in the ultimate, the conclusion as to whether one is an employer of another or not is always a question of fact to be determined from all of the evidence introduced in the particular case. Hence, while I have no disagreement with the doctrine in the cited cases and have the highest respect for and confidence in the judge who rendered the state court decision, I am nevertheless under the duty to make that determination of fact here in this case by weighing all of the evidence.

In that respect I must say that I was not impressed by the witnesses for the government. All of them signed waivers; all of them were members of the organization and pledged their word to the organization and to one another and to the people of California that they were for the measure and would support it; almost all, if not all, of them signed affidavits subsequent to the signing of the waiver to the same effect. There were something like fifty thousand people engaged in the organized campaign who signed waivers, but with all of the unlimited facilities of the government to secure evidence, nothing has been produced to show that a single one of all of the persons offered to pay an employee's share of the Social Security tax during the campaign or ever brought the subject up with the plaintiff during the period involved. Most of the government's witnesses indicated an obvious prejudice against the plaintiffs. Many of them were either securing or attempting to secure unemployment insurance. Many of them had facile memories and ready answers when testifying on direct examination for the government, but on the same points when cross-examined or examined by the court their memories became faulty and they gave evasive answers. Hankins, one of the principal witnesses for the government, was typical, and I deem it necessary to perhaps comment upon his testimony in order to illustrate the factors which were taken into consideration. He was in charge of Northern California with headquarters in San Francisco. He had no hesitancy in letting thousands of bewildered people who were searching for some security in their support of this act believe that he believed in the cause and was for it. He signed the waiver. He secured volunteers. He did all of the things a manager of a campaign would do, and he did them with enthusi-

asm. And yet he testified on the stand that he did not believe in the measure. To quote his testimony, he said he "never had any interest in seeing the pension law enacted," although he never told that to the Allen brothers or any one else during the period of the campaign, but just to the contrary. He testified that out of the $25 a week which he received from the plaintiff he paid $5 a week for his room in a hotel in San Francisco, and fed and clothed himself and saved out of that $10 a week. He started a rival pension plan after he left the plaintiff and tried to take over the personnel of the plaintiff's organization and followed the same plan. He secured 2,400 members to this rival organization. He had some employees but paid no Social Security tax and filed no Social Security return, and stated that when he was talking to some Treasury Department agent about it the agent told him to forget it. From all of these things and his manner of testifying, I must say that his testimony is without credence.

I have no intention of trying to review the 3,000 pages of transcript of the testimony nor to review the hundreds of exhibits which were introduced, and of necessity I must limit my comments on the evidence.

The plaintiffs' activities covered a multitude of things, engaging thousands of persons. Any one with the slightest experience in such matters knows that in the hurly-burly and intensive pressures that exist to make moves and countermoves in a state-wide campaign, it is a practical impossibility to keep a record of the names of persons who help, the hours and times they work, and, in fact, to know whether or not they actually do work. Newspapers, pamphlets, meetings, radio talks and times, contact with different groups and organizations where endorsements are sought, whether those groups or organizations are actual or real, or whether they are phoney, were made as they have to be made. Odd jobs connected with the distribution of such material, which called for the payment perhaps of only a dollar or two to a person whose name is not secured and who is never known, actually, and did here, constantly arise. In these services boys, elderly men, and women

were used, and to have required the taking of the names and addresses of these people and to have kept records and books and made reports on all of them as to the hours and times of work would result in such an extended and complicated system of books and records that a campaign would have been well nigh impossible. Especially is this true if that were required for all the different branch headquarters of the state-wide campaign which occurred in this matter on two different occasions, each of which was perhaps one of the wildest, most turbulent, and intense in the history of the state, and which cut across all economic, social, and political lines on both sides.

The plaintiffs did keep records, however, of those attached to and working out of their main headquarters. The list of such persons for both the Los Angeles and San Francisco headquarters is Exhibit 10-B. It is divided into fourteen classifications.

█ As to all of the other persons not included in that list the evidence from an overall point of view is clear that none of the elements were present which make up the relation of employer and employee, and as to all of the persons engaged in the campaign whose names do not appear on that list I find and will find that they were volunteers, that they devoted whatever time they respectively felt that they were willing to give for the advancement of the cause and the dissemination of its philosophies freely and voluntarily, without restriction, requirements, obligations, or conditions as to the hours or places of work, without compensation or other financial reward measured by performance, time or any of the other considerations which go to make up the elements of employer and employee, and that where reimbursements were made they occurred as nearly as possible in an amount which was their actual and necessary expenses incurred in connection with their voluntary and gratuitous services.

█ The problem now reduces itself to a determination of whether or not the relationship of employer and employee existed as to the persons who are listed on Exhibit 10-B. As stated, there are fourteen classifications, as follows: Directors,

speakers, office workers, administrative office workers, area managers, assembly district managers, field workers, public relations contact, investigations, printing, switchboard operators, independent contractors, newspapers, sound tracks, and motion pictures.

I have been much impressed by the testimony and the evidence adduced on behalf of the plaintiff in connection with these workers, particularly but not exclusively by the waivers, the affidavits, the fact of membership, and the complete lack of any demand for Social Security coverage by any of the thousands of persons during the period covered, and I accept generally their position as correct as shown by the evidence, and will find from an overall view of all of the evidence that as a matter of fact the relationship of employer and employee did not exist as to any of the classifications of workers so designated on Exhibit 10-B except as to classification No. 3, the office workers, and classification No. 10, the switchboard operators. As to these two classifications I am satisfied from all of the evidence that the plaintiffs not only had the right to but did control and direct them, not only as to the result to be accomplished by their work, but also as to the details and means by which it was to be accomplished, as well as the hours and times of work. I cannot from the evidence draw that conclusion of fact as to the other classes of workers which are designated in Exhibit 10-B. In my judgment, they fall within the same category, under all of the evidence, as the workers in the campaign who are not listed on their Exhibit 10-B, and I will so find.

Judgment will be for the plaintiff accordingly as to all classifications of workers except classifications 3 and 10 as listed on Exhibit 10-B, and plaintiff will prepare the findings of fact and conclusions of law.

If, upon consultation with the defendant, any difficulty is encountered in calculating the sums which might be due from these approximately 250 people, I will settle it by a hearing or by reference to a master.

There is one other thing that needs to be disposed of. This relates to Exhibit GGG, which purports to assign the plaintiff's cause of action to the Payroll Guarantee Association, Incorporated, a California non-profit corporation. The California statutes which might permit such an assignment do not prevail here in the federal court, as there is a special federal statute which controls. It is Revised Statutes 3477, which is Title 31, U.S.C.A. § 203. The statutes make any attempted assignment "absolutely null and void, unless they are * * * executed * * * after the allowance of such a claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof."

Obviously, these conditions precedent to the validity of the assignment are not here, and such attempted assignment is therefore null and void, and I will so hold, and now deny the motion of the plaintiffs of February 11th to amend the complaint to conform to the proof.

While the claim for refund was made and the action filed by both the 1938 organization and the 1939 organization, the evidence clearly shows that the funds when seized were the property of the 1939 organization, namely, "National Campaign Committee, Retirement Life Payments Association, $30 a week for life," and the judgment is accordingly in favor of the last-named organization.