*Corp.,* 296 F.2d 708, 717, 131 USPQ 456, 463 (10th Cir. 1961). Mere colorable variations of a patented invention do not avoid infringement. *Sanitary Refrigerator Co. v. Winters,* 280 U.S. 30, 50 S.Ct. 9, 74 L.Ed. 147, 3 USPQ 40 (1929). Likewise, impairment of function and lessening of results, efficiency or advantages do not avoid infringement where the substance is nevertheless appropriated. However, an impaired or inferior device which does not include the substance or novelty of the claimed invention does not infringe. *Pennsylvania Research Corp. v. Lescarboura Spawn Co.,* 29 F.Supp. 340, 347, 42 USPQ 375, 382 (E.D.Pa.1939); *Abbott v. Barrentine Mfg. Co.,* 255 F.Supp. 890, 899, 149 USPQ 287, 294 (N.D.Miss.1966); *Stearns, supra; Admiral Corp., supra.*

In the present case, it has been determined that the substance or novel aspect of claim 3, which distinguishes the combination from prior art combinations, is the composite switch and pinch valve assembly. This is evident, as enunciated above, from a thorough consideration of the prior art, the prosecution history of the application, and the patent itself. Infringement by the accused structures is not proved since an essential element of claim 3 is not present in any accused device. *Strumskis, supra; Stearns, supra;* and *Kay Patents Corp. v. Martin Supply Co.,* 202 F.2d 47, 51, 96 USPQ 225, 228 (4th Cir. 1953).

It is concluded that defendant has not infringed claim 3 of the Kabnick patent. Plaintiffs, accordingly, are not entitled to recover and their petition is dismissed.

### CONCLUSION OF LAW

Upon the findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover, and the petition is dismissed.

James P. McCORMICK

v.

The UNITED STATES.

No. 173–73.

United States Court of Claims.

March 17, 1976.

Herbert L. Awe, Washington, D. C., attorney of record, for plaintiff. Michael Mulroney, Washington, D. C., and William L. Goldman, of counsel.

Donald H. Olson, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, Washington, D. C., for defendant. Theodore D. Peyser, Jr., Washington, D. C., of counsel.

Before SKELTON, KUNZIG and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's exceptions to the recommended decision, filed March 24, 1975, by Trial Judge Roald A. Hogenson, pursuant to Rule 134(h), having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF TRIAL JUDGE

HOGENSON, Trial Judge:

This is an action to recover an alleged overpayment of Federal employment taxes for the quarter ending September 30, 1972. Commonly known as social security taxes, such taxes are imposed on wages by the Federal Insurance Contributions Act, under section 3101 of the Internal Revenue Code of 1954 as to the employee's share of the tax, and under section 3111 as to the employer's share, with the employer charged by law with collecting and paying the employee's share of the tax by withholding from wages.

The issue is whether certain persons known as free-lance exercise boys (riders) and hotwalkers, who perform services for plaintiff in his business of training racehorses, are independent contractors, in which status their compensation for such services would not be wages subject to the tax, or whether such persons are employees of plaintiff, with their compensation as wages subject to the tax.

For the purposes of such taxes, section 3121(d) defines the term "employee" as "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee * * *."

For the reasons stated herein, it is concluded that plaintiff's free-lance exercise riders and hotwalkers are employees of plaintiff, that the employment taxes were properly collected from plaintiff, and that plaintiff's petition should be dismissed.

The facts in this case are set forth in detail in the findings of fact which follow. They will be summarized here only to the extent necessary to explain the basis for the decision that plaintiff is not entitled to recover.

Taxpayer, James P. McCormick, is a public trainer of thoroughbred racehorses. As such, he trains horses of various owners to win horse races. Sometimes he is the owner or partial owner of horses he stables and trains. His obligations to a racehorse owner include providing shelter, feed, the basic equipment needed for training, daily maintenance and a training program directed toward making the horse a winner of races. The trainer is paid a flat daily fee of approximately $20 for his services and receives a portion of the purse when a horse wins a race. The trainer's relationship to the owner is that of an independent businessman. When necessary peripheral services, such as those of a veterinarian or a blacksmith, are needed the trainer engages the personnel and the cost is normally paid by the owner. In the regular conduct of the horse training business, the trainer retains the services of personnel necessary to assist him in properly training the horses.

Plaintiff uses the services of a foreman, grooms, hotwalkers and exercise riders on a regular basis. He acknowledges that those among such personnel who have a regular, permanent relationship with him are his employees for Federal employment tax purposes. As is commonly done in the racehorse training business, plaintiff obtains the services of other hotwalkers and exercise riders on an irregular basis to walk or exercise horses when the regular personnel are unavailable. It is the status of these people, hired on an irregular, nonpermanent basis, that is in issue here.

The training program involves conditioning the horse for racing through a regimen devised by the trainer according to the trainer's assessment of the horse. The program involves giving the horse some exercise every day. The basic exercises take the form of a "walk" (leading the horse at a walking pace to provide light exercise or to "cool" the horse gradually after strenuous exercise), a "gallop" (running the horse on the track at less than full speed), and a "work" (running the horse at full speed for short distances). The "walk" is performed by a person called a "hotwalker," or when available and weather conditions permit, by a hotwalking machine which mechanically leads the horse around in a circle. An exercise rider puts the horse through a "gallop" or a "work." The trainer tells such rider what type of exercise is to be accomplished and at which speed and for what distance the horse should be ridden on each occasion.

The trainer is normally in attendance at the track, whether a regular or irregular exercise rider is handling the horse, observing the exercise. The trainer is more cautious and more likely to be present when an irregular or so-called free-lancer[1] is handling the horse because of the free-lancer's unfamiliarity with the horse, or his lack of understanding of the trainer's "modus operandi," or because of the trainer's unfamiliarity with the free-lancer's ability. As a trainer's confidence in a free-lancer increases, the amount of instruction and observation may, to a degree, lessen. The trainer has the authority to countermand an instruction or terminate a free-lancer's job when the work is in progress. In the case of the exercise rider, this is obviously difficult and sometimes impossible to do because of the problem of controlling a racehorse and its rider while in motion. Such orders are rare, given only on the most unusual occasions.

An exercise rider must be experienced and highly skillful to handle a thoroughbred racehorse. To ride an animal as temperamental and physically adept as a racehorse through the trainer-prescribed routine calls for a significant degree of equestrian proficiency. In a literal sense, the exercise rider

---

1. Wherever applicable the word "free-lancher" will refer both to exercise riders and hotwalkers. Where the word obviously does not apply to hotwalkers, it will refer only to exercise riders.

physically controls the horse when he is astride it. However, the rider's range of discretion is narrow in nature—limited to knowing when to discontinue an exercise to avoid injury to the horse. The exercise rider rarely decides what exercise the horse will do or how it will be done. But in terms of physical control, the rider makes the horse successfully perform the exercise. To conform with the trainer's instructions, the exercise rider must possess good judgment concerning the stride (distance covered with each movement of the horse's legs) and pace (distance covered in a given time). The exercises normally take place during morning hours when the track is available for that purpose, both the regular and free-lance services being performed during that time. The trainer generally supplies the saddle and blankets for the horse. To save time and prevent disease the horse is usually saddled and ready for the free-lancer to ride. The free-lancer's equipment consists of riding boots and a protective helmet, required by track rules. All exercise personnel are covered for risk of injury while riding a horse, either through the trainer's workmen's compensation insurance (state or privately operated) or through the Horsemen's Benevolent Protective Association Assistance Fund.

The major performance difference between the free-lancer and the regular exercise rider is: When the exercise ends, the free-lancer's work for that specific trainer is done, whereas the regular exercise rider has to be available to perform other duties for the trainer. Free-lance exercise riders are frequently looking for a trainer to hire them on a regular employment basis. Those having regular employment with a trainer endeavor to earn extra money by riding for others on a free-lance basis whenever they can. Harry Stauffer, one of the free-lancers whose employment status is

here in dispute, was an exception. Stauffer had been a jockey for 10 years and returned to being an exercise rider. He relished being able to work when he pleased, viewed himself as an independent and did not want to work for anyone on a regular basis. Although free-lancers may work for more than one trainer, they develop familiarity and experience with certain horses, and they usually ride the same horses every day.

During the period in issue, both the taxpayer's free-lancers and his regular exercise rider (Donny Miller) were paid on a per-ride basis. Subsequent to the period in issue the taxpayer provided Miller a guaranteed minimum salary rate not entirely predicated on the number of horses he rode. Free-lancers were paid only for horses ridden, whereas regular employees also enjoyed a Christmas bonus, received vacation pay and shared in "stakes," which is a portion of the prize money received when a horse wins.

For the period in issue, the third quarter of 1972, taxpayer complied with Rev.Rul. 72–155[2] which holds that free-lance exercise riders and hotwalkers were employees of the trainer, and timely paid the Federal employment taxes for the individuals[3] whose employment status is in dispute. Subsequently taxpayer filed a claim for refund which stated that these people were not employees but independent contractors and protested that the legal conclusions in Rev.Rul. 72–155 were erroneous. The Government failed to issue a statutory notice of disallowance within the prescribed 6-month period, and the taxpayer subsequently filed suit in this court.

Plaintiff would have a narrow test applied as to what constitutes control for defining the relationship between a racehorse trainer and free-lancers in the conduct of the horse training business.

In summary, plaintiff argues that complete control of the racehorse by the free-

2. Rev.Rul. 72–155, 1972–1 Cum.Bull. 322, holds that the racehorse trainer exercises or has the right to exercise such control over the freelance exercise personnel and hotwalkers as is necessary under the usual common law rules to establish the relationship of employer and employee for Federal employment tax purposes.

3. Ralph T. Anderson and Joseph E. Thomas, hotwalkers. Larry Eversole, Harry Stauffer and Herman Amos, exercise riders.

lancer when in his custody, with the accomplishment of the prescribed exercise dependent upon the free-lancer's equestrian skills, combined with the fact that the free-lancer's services terminate after the completion of the exercise for which he is retained, and considering the impracticability of the trainer's exerting control or terminating the services of the free-lancer during the course of the exercise, requires a determination that the free-lancer is an independent contractor. As to the free-lancer exercise rider, plaintiff's position merits serious consideration. As to the free-lance hotwalker, the argument lacks force, because there is no doubt about control of the hotwalker by the trainer during the performance of services.

■ The basic standard for determining the presence or absence of an employer-employee relationship is whether the person performing the services for another is subject to the other's control or right to control. *Cape Shore Fish Co. v. United States,* 330 F.2d 961, 964, 165 Ct.Cl. 630, 636 (1964).

Many factors are relevant in applying realistically the common law control test [4] such as existence of control and supervision, or right to control performance (*Deecy Products Co. v. Welch,* 124 F.2d 592, 598 (1st Cir. 1941)); the degree of control required and applicable in the particular vocation involved (*United States v. Webb,* 397 U.S. 179, 192, 90 S.Ct. 850, 856, 25 L.Ed.2d 207, 215 (1970)); opportunity for profit or loss, investment in facilities, burden of risk, whether the services are part of the regular business of the person for whom performed, and whether substantial costs are incurred by the performer of the services (*United States v. Silk,* 331 U.S. 704, 716–19, 67 S.Ct. 1463, 1469–71, 91 L.Ed. 1757, 1769–70 (1947)); degree of skill required (*McGuire v. United States,* 349 F.2d 644, 645 (9th Cir. 1965)); permanency of the relationship, *Avis Rent A Car System, Inc. v. United States,* 503 F.2d 423, 430 (2d Cir. 1974).

No one factor is persuasive or to be considered exclusive. The relationship is to be ascertained by an overall view of the entire situation, not by any rule of thumb, nor by the presence or absence of a single factor. The result in each case must be governed by the special facts and circumstances of the case itself. *Cape Shore Fish Co. v. United States, supra,* 330 F.2d at 964–65, 165 Ct.Cl. at 636–37.

■ The right or degree of control necessary to make one an employee varies with the activity involved, but it is the right or degree of control that is commonly exercisable in that business. *United States v. Webb, Inc., supra,* 397 U.S. at 190–93, 90 S.Ct. at 855–57, 25 L.Ed.2d at 214–16. All that is required is that the right of control exists and be available for exercise. *Deecy Products Co. v. Welch, supra,* 124 F.2d at 598.

■ Taxpayer, as well as any other racehorse trainer, was retained by racehorse owners to exercise his own skill and judgment in conditioning horses for races. He did not retain others to determine what program was to be applied to each horse, but made his own decisions, and issued instructions to those performing services for him in accordance with his own program. His instructions to free-lance exercise riders and hotwalkers were in furtherance of his own program of conditioning a horse. The exercising of any one of his assigned horses whether performed by a regular or an irregular exercise rider or hotwalker, was done as an integral part of his business, and his instructions to each free-lance exercise rider or hotwalker were an integral part of his program to accomplish his own plan of conditioning a racehorse for a definite purpose—to participate as a winner in a particular race or races.

Treasury Regulations § 31.3121(d)–1 and § 31.3306(i)–1 furnish a guide as to where control rests in this case. Both provide in part:

**4.** *See Illinois Tri-Seal Products, Inc. v. United States,* 353 F.2d 216, 224–29, 173 Ct.Cl. 499, 512–19 (1965), for the judicial, administrative and legislative developments leading to unequivocal application of the common law test.

* * * That is, an employee is subject to the will and control of the employer not only as to *what* shall be done but *how* it shall be done. * * * [Emphasis added.]

Plaintiff argues in effect that the "what" and "how" are limited to the narrow focus as to what the free-lance rider will do and how he will employ his skills in the riding of a racehorse in an exercise directed in accordance with the instructions of the trainer. The broader view must reasonably be applied in this case. The "what" and "how" concern the distance the exercise will cover and the *method to be employed*, whether by walking, galloping, working, running in company with another horse, or otherwise, all as instructed by the trainer in accordance with his planned program. This is obviously the degree of control used in the conduct of a racehorse trainer's business, both with respect to regular and irregular exercise riders. *United States v. Webb, supra.* The requisite control is not negated by the circumstance that the exercise rider must have and exercise equestrian skills and good judgment in carrying out the instructions of the trainer.

Of course, the exercise rider is expected to use reasonable discretion in the handling of a racehorse, and not ride the horse to ruin. Such discretion is not unlike that required of any skilled employee given physical control over an employer's powerful and expensive equipment, to operate the equipment with reasonable care in accordance with the standards of his trade and avoid unnecessary damage.

The right of control in this case cannot be limited to the literal physical control which an exercise rider must exercise over the racehorse during the prescribed ride, and to the circumstance that the trainer does not place himself astride the horse or otherwise place himself in position to direct the performance of the services during the course of the exercise. The exercises prescribed by the trainer are not separate and distinct transactions, unrelated to his structured training program, and his retaining of exercise riders and hotwalkers, whether on a regular or irregular basis, must be considered the hiring of employees for the conduct of his own business operations.

As plaintiff operated his exercise program, it would have been difficult, if not impossible in some instances, for him to furnish directions and instructions to an exercise rider during the course of such ride. However, it is significant that plaintiff, having given precise instructions, placed himself in position to observe the exercise ride. This was known to the exercise rider, and common sense dictates that the watchful eyes of a supervisor are a realistic form of exercise of control of the performance of employees. Moreover, the evidence is clear that on occasion a trainer was able to communicate instructions to the exercise rider during the course of the exercise. With respect to the hotwalkers, of course, there was no practical problem of control during the performance of a particular assignment.

Another factor to be considered in this case is who furnished the equipment. Where equipment is necessary to perform a task, particularly where it is of significant value requiring substantial investment, the person furnishing such equipment in the performance of services may be deemed to be an independent contractor. It is one circumstance to be considered as to whether he is under the control of the alleged employer. *Powers v. United States*, 424 F.2d 593, 600, 191 Ct.Cl. 762, 773 (1970). The hotwalkers furnished nothing. The free-lance riders in this case furnished boots and helmets, which are of nominal value, particularly when compared to the saddles and other equipment furnished by the trainer. The fact that the trainer furnished the saddles as a matter of expediency does not negate the weight of this factor because it also relates to the investment factor.

The trainer had a significant investment in his business in addition to the cost of equipment provided for the exercise activity. The free-lance riders and hotwalkers by contrast had insignificant monetary investment in the services they provided. The trainer had opportunity for profit or

loss that the free-lancers completely lacked. The trainer shared in the rewards when horses won. He had the option of reducing expenses to maintain or increase profits. The free-lancer had no economic leverage. He was restricted to the money that could be earned based on the capacity to ride or lead horses.

The burdens of risk were also unknown to the free-lancer, but common to the trainer. The trainer was subject to loss on his investment and could be denied income by either failing to produce winning horses or to control expenses. In addition, the trainer had to answer to the owner regarding care, maintenance and progress of the horse. The free-lancers, by contrast, were not obligated to anyone and assumed no financial risk that an independent businessman must undertake, unless one considers failure to be paid their wages such a risk. The free-lancers did not even protect themselves against the risk of personal injury. Parties other than the free-lancer assumed the responsibility and cost of preventing injury by providing "pony boys" to catch the horse if the rider lost control during an exercise. The personal injuries of a free-lancer are covered by the trainer's workmen's compensation insurance (as though he were a regular employee) or by the Horsemen's Benevolent and Protective Association Assistance Fund (which fund provides assistance to certain persons connected with horse racing when help is unavailable elsewhere—to which fund the trainers contribute through the payment of fees charged for bringing horses to the starting gate before races). The free-lancer earned his pay (or at least his right to it) no matter what happened, and he had no responsibility except to ride or lead the horse as he was told.

Considering all the foregoing factors, the free-lancers are substantially similar to the coal shovelers in *Silk, supra*; the produce unloaders in *McGuire, supra*; and the car shuttlers in *Avis, supra,* all held to be employees, not independent contractors, even though transients.

The regularity or irregularity of employment did not make a substantial difference in the trainer's calculation of pay, nor did it affect the methods of payment to the regular and free-lance riders and hotwalkers. All of the workers were generally paid at the same time (Friday or Saturday of the week in which the services were performed), in the same way (by check) and at the same place (the trainer's stable). The differences in pay (free-lancers did not receive bonuses, vacation pay or any share in a racehorse's winnings) are inconsequential in the overall setting of the relationships involved.

Of course, the trainer did not unilaterally set the precise time of performance of duties by the free-lancer, but a definite time was mutually agreed upon. The rider was restricted to the morning hours when the track was available for exercising, and the rider had no choice about postponing an exercise to suit his personal convenience. The hotwalker performed his services when a horse needed a walk, not when the hotwalker chose to act. Of course, no free-lancer had to accept any assignment, but none had any discretion about the time of performance of a job accepted.

It appears that the trainer and the free-lancers held the belief that they did not have the status of employer/employees, but that the free-lancers were independent contractors. The validity of their belief is clouded by a serious question as to whether they had any clear understanding of the legal distinctions between the two relationships. It would appear that their attitudes were based primarily on the irregularity and impermanency of their relationships.

■ It is recognized that in close cases, the view of the interested parties with respect to payment of employment taxes is significant. *Illinois Tri-Seal Products, Inc. v. United States, supra,* 353 F.2d at 218, 173 Ct.Cl. at 502.

The Treasury Regulations cited herein state in effect that the description or designation by the parties to a relationship that services are being performed in the capacity of an independent contractor, as distin-

guished from an employee, is immaterial, if the relationship of employer/employee is established under the facts and circumstances of the particular case. In *Bartels v. Birmingham,* 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947), the Supreme Court held that the parties cannot even change the relationship by contract, when the relationship was not in fact what they agreed it was. Subject case is not the close one in which significance should be accorded to the views of the parties.

Under the facts and circumstances of this case, both the free-lance exercise riders and the hotwalkers were employees of taxpayer under the common law test.

Accordingly, plaintiff correctly complied with Rev.Rul. 72–155, and is not entitled to recover the Federal employment taxes paid by him on account of the free-lance workers involved in this case.

**MORTON–NORWICH PRODUCTS, INC., Appellant,**

v.

**S. C. JOHNSON & SON, INC., Appellee.**

**Patent Appeal No. 75–619.**

United States Court of Customs and Patent Appeals.

April 8, 1976.

Anthony J. Franze, Norwich, N.Y., attorney of record, for appellant.

Robert M. Newbury, Chicago, Ill. (Pattishall, McAuliffe & Hofstetter) Chicago, Ill., attorneys of record, for appellee. Harold F. Greiveldinger, H. Leroy Richards, Ralph H. Lane, Racine, Wis., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.