William C. LIEB, Jr., d/b/a AAA Exterminators, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 75–81–C.

United States District Court, E. D. Oklahoma.

March 31, 1977.

As Amended April 13, 1977.

**1016**

Castleberry, Lisle & Kivel, Oklahoma City, Okl., for plaintiff.

M. Carr Ferguson, Asst. Atty. Gen., Washington, D. C., William W. Guild, Dallas, Tex., G. Thomas Rhodus, Attys., Tax Div., Dept. of Justice, Washington, D. C., Richard A. Pyle, U. S. Atty., Muskogee, Okl., for defendant.

## MEMORANDUM OPINION

MORRIS, Chief Judge.

### I. *INTRODUCTION.*

This is a civil tax controversy in which plaintiff seeks to recover $2,231.06 in social security and withholding taxes collected for certain quarters during the years 1964 through 1967, 1971 and 1972, which the taxpayer claims were erroneously assessed and collected. The defendant counterclaims for an additional $82,482.23 for employment tax deficiencies, penalties and interest allegedly assessed by the Commissioner of Internal Revenue. The parties seem to be in agreement by virtue of their proposed findings of fact that these alleged tax deficiencies are comprised of social security taxes, withholding taxes, unemployment taxes, penalties, and interest for the years 1971 and 1972. Trial was had to the court, sitting without a jury, on November 22, 1976.

Plaintiff claims that the telephone solicitors, who contact potential customers in order to determine their need for plaintiff's services, and the exterminators who perform the pest control and extermination services, in connection with plaintiff's exterminating business, are independent contractors rather than employees. Therefore, plaintiff argues, he is not required to withhold social security and withholding taxes on them. The defendant, on the other hand, contends that both categories of workers are the plaintiff's employees and that plaintiff is therefore liable for any employment taxes not withheld and paid.

Upon consideration of all the evidence adduced at trial the court makes the following findings of fact and conclusions of law:

### II. *FINDINGS OF FACT.*

1. The plaintiff operates a sole proprietorship called AAA Exterminators, engaged in a variety of pest control and termite extermination services. The principal office has been in McAlester, Oklahoma, and branch offices have been maintained at various times in Oklahoma City, Tulsa, Dallas, Texas and other locations principally in the state of Oklahoma.

2. Telephone soliciting was generally conducted either by ladies working out of one of plaintiff's offices, or by ladies who worked in their own homes. Only those solicitors who worked in the plaintiff's offices are at issue in this lawsuit. In this connection plaintiff admits in his proposed findings of fact, Fact No. 14, that "[t]he government did not assess any of the deficiency based upon the earnings of solicitors who worked only off the company premises, but limited it to those who worked in the offices."

3. Although the method and rate of pay varied slightly from individual to individual depending upon the time period and the office involved, telephone solicitors were generally paid a weekly salary and were required to produce a certain number of leads per day. While there was testimony to the effect that the salary was not increased for surpassing the quota, the majority of the solicitors who were called to testify stated that they were paid at a graduated scale, namely a certain amount for one to three leads per day, a higher amount for four to eight leads per day, and still a higher amount for nine to twelve leads per day. In addition, a flat sum was paid for any lead which had been obtained by using the solicitor's home telephone.

4. The solicitors were required to stay in the office for the entire period of time for which they were scheduled per day and per week even if they had obtained the requisite number of leads before that time period expired.

5. Several of the solicitors who testified worked in shifts. They were required to work either during the morning or during the afternoon shift, which typically were six hours long. The solicitors worked either six or five days per week.

6. The plaintiff provided the solicitors who worked in the office with all the necessary equipment, that is, pads and pencils, a desk, a telephone, a telephone directory, customer lists, and lead sheets. No other payments or benefits were provided by the plaintiff.

7. Solicitors were also provided with a set speech or script which they were to repeat in making their telephone contacts.

8. Plaintiff had the right to and did in fact control the telephone solicitors not only as to the results to be accomplished but also with respect to the details and means by which those results were to be accomplished.

9. The telephone solicitors were the plaintiff's employees and were not independent contractors.

10. The plaintiff's failure to timely deposit the employment taxes with respect to the solicitors was due to reasonable cause and not due to willful neglect.

11. Exterminators operated under the license held by plaintiff. Nearly all of them furnished their own vehicles, equipment, tools, selected and bought their own chemicals and provided their own oil, gas, vehicle insurance and maintenance. Plaintiff did not require the exterminators to purchase their chemicals from him. The equipment required usually consisted of a truck or other vehicle, a pump, a motor, a drill and a spray gun. The investment in equipment alone, apart from the vehicle, ran from $500.00 to $1000.00. Two of the exterminators testified that they rented their vehicles from the plaintiff and three testified they rented the plaintiff's equipment.

12. Nearly all of the exterminators were paid on a commission basis. The commission was a percentage of the price charged to the customer and it varied during the years here involved from 15% to 50% depending on whether the work was a spray job or a terminate job, was inside or outside, whether it was preventive or curative and depending upon whether it was an isolated job or a yearly renewal. Generally, the exterminators were not paid their commissions until the customer paid the bill. If the bill was not paid the commission was not paid. If an exterminator rented a company truck or company equipment he received a commission which was at a lower percentage than was received by those who furnished their own vehicle and equipment. Two exterminators, Fred Schimming and Godfrey Goff, were on a straight $100.00 per week salary and not on a commission.

13. Exterminators were not required to account for their time. They were not required to come to the office at a certain time in the morning, although most of them usually did come in between 7:00 a. m. and 8:00 a. m. because this was when the "leads" secured by the telephone solicitors would be distributed to them. An exterminator coming in late simply ran the risk that no "leads" would be left for him. The "leads" which had been obtained by the solicitors were distributed as work orders.

14. Exterminators were free to accept or reject work orders. After going out on the job they usually would "call in" to the office in the afternoon for further work orders, but they were not required to do so. Usually they set the price for their services with the customer, except they did not do so when a price had been quoted by a solicitor in connection with a spray job or a "special." Nevertheless, they were free to sell additional exterminating services to the customer and set the price for those services based on the type of work to be done, its difficulty, and the size of the job. Because these factors had to be taken into consideration in determining a price for ex-

terminating services, the exterminators rather than the solicitors would frequently make the final agreement with the customer regarding price and service. If they had skill in carpentry, masonry or similar repair or improvement work they would negotiate with the customer directly with respect to the price and performance of any such required work. Any sum charged for this kind of work belonged to the exterminator and he had no obligation to share this sum with plaintiff.

15. In addition to the "leads" furnished to the exterminators by plaintiff, they were free to solicit their own jobs and did so. They received other jobs as referrals from customers and inquiries from neighbors of customers.

16. From time to time sales meetings were held in plaintiff's Tulsa office and other offices. Exterminators frequently attended but were not required to attend.

17. After picking up their work orders in the morning the exterminators were not required to serve the customers in any particular order. They made their own determinations. If the work order showed "A.M." or "P.M.", however, or a specified hour, they would usually heed the customer's request and would do the work when requested. Sometimes, however, they would call the customer if something prevented them from arriving at the requested hour. In this connection in Tulsa they would sometimes trade work orders with each other to avoid the necessity of crisscrossing back and forth across town or to work out for themselves a more convenient time schedule. They were not required to work a certain number of hours per day, but could stop working at any time during the day.

18. New men received their training by accompanying experienced exterminators on their jobs. Trainees received no compensation from plaintiff. The experienced man and the trainee could agree to whatever commission split or other mode of payment they wanted to; no consent or approval of plaintiff was required.

19. Some exterminators hired their own helpers. Consent of plaintiff was not secured or required. Helpers' names were not listed on the daily report turned in to plaintiff, although a place was provided for them to be listed. When a helper was on the job the exterminator paid the helper; the plaintiff did not.

20. Exterminators submitted daily reports which showed the name of the customer, the kind of work done (pest or termite), the amount charged for the job and whether it was collected or was to be billed. Defendant's Exhibit 1.

21. Exterminators were expected to handle the complaints of their own customers without receiving any additional compensation therefor from plaintiff. If a man terminated his relationship with plaintiff without handling his customers' complaints, plaintiff would have another exterminator take care of them and paid him for the follow-up work.

22. Before plaintiff and an exterminator entered into any legal relationship, whether as employer-employee or as independent contractor, as the case may be, the exterminator was sometimes, though not always, required to fill out a form. See Defendant's Exhibits 2 and 3 and Plaintiff's Exhibit 4. Different forms were used at different times and over the years the form has changed. Defendant's Exhibit 2 suggests the relationship between the parties is that of employer-employee. Defendant's Exhibit 3 suggests the relationship to be *either* employer-employee *or* that of an independent contractor. Plaintiff's 4 suggests the relationship to be that of an independent contractor.

23. When plaintiff ran advertisements in newspapers in attempting to secure exterminators, inference may be drawn from the advertisements, which is supportive of both legal relationships. Some read: "Route serviceman $150.00 per week." Others read: "Want man to represent us in this area for pest control service, make $300 weekly and be his own boss." See Defendant's Exhibits 7, 8 and 9 and Plaintiff's Exhibit 3.

24. When exterminators called on customers who wanted to "charge" the work instead of paying cash, they were instructed to permit them to charge. With respect to their vehicles they were requested to display an AAA sign thereon.

25. Plaintiff could refuse to give work orders to an exterminator and could terminate the relationship because of dishonesty or poor performance resulting in customer dissatisfaction.

26. There were no reprisals by plaintiff against an exterminator who did not attend sales meetings, refused certain job orders or did not call in during the day. No minimum number of jobs was required and no minimum number of hours worked was required.

27. Plaintiff granted no fringe benefits of any kind to exterminators such as paid vacation, paid holidays, overtime pay, bonuses, accident or health insurance, sick pay or workmen's compensation.

28. Plaintiff was only interested in the results to be accomplished by the exterminators. He was not interested in and did not control the details and means by which those results were to be accomplished.

29. Viewing the evidence as a whole the court finds that, with the exception of the two salaried men who testified, the exterminators were independent contractors and not employees of the plaintiff.

30. One of the salaried men, Fred Schimming, was used extensively by plaintiff to settle customers' complaints and was required to check in at the office at the end of each day. The other man on salary, Godfrey Goff, worked six days a week, and in addition to termite and pest control work was required to empty trash cans and waste paper baskets and perform other manual labor.

31. The plaintiff controlled the two salaried exterminators not only as to the results to be accomplished but also with respect to the details and means by which those results were to be accomplished.

32. The two salaried exterminators were the plaintiff's employees and not independent contractors.

33. The plaintiff's failure to timely deposit the employment taxes with respect to the two salaried exterminators was due to reasonable cause and not due to willful neglect.

34. Any conclusion of law which may more properly be deemed a finding of fact is hereby so found and incorporated into the findings of fact.

### III. *CONCLUSIONS OF LAW.*

1. The court has jurisdiction of this action and the parties. 28 U.S.C. § 1346(a)(1) (1970).

2. Any finding of fact which may more properly be deemed a conclusion of law is hereby concluded as a matter of law.

3. I.R.C. § 3121(d)(2) defines employee as "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee." The relevant factors necessary for a determination of who are common law employees are set forth in 26 C.F.R. § 31.3121(d)–1(c) (1976):

(c) Common law employees. (1) Every individual is an employee if under the usual common law rules the relationship between him and the person for whom he performs services is the legal relationship of employer and employee.

(2) Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employ-

er. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not as to such services an employee under the usual common law rules. Individuals such as physicians, lawyers, dentists, veterinarians, construction contractors, public stenographers, and auctioneers, engaged in the pursuit of an independent trade, business, or profession, in which they offer their services to the public, are independent contractors and not employees.

(3) Whether the relationship of employer and employee exists under the usual common law rules will in doubtful cases be determined upon an examination of the particular facts of each case.

The Supreme Court of the United States in *United States v. Silk*, 331 U.S. 704, 716, 67 S.Ct. 1463, 1469, 91 L.Ed. 1757 (1947), suggested that "degrees of control, opportunities for profit or loss, investment in facilities, permanency of relation and skill required in the claimed independent operation" are important factors in determining whether an employer-employee relationship exists. *See also United States v. W. M. Webb, Inc.*, 397 U.S. 179, 184–88, 90 S.Ct. 850, 25 L.Ed.2d 207 (1970); *Bartels v. Birmingham*, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947).

In a case which arose prior to the Supreme Court's *Silk* decision, the Tenth Circuit found an employer-employee relationship to exist between taxicab drivers and the defendant company. In so holding the court pointed to the following indicia of control exercised by the defendant company:

This company has and exercises the right to say whether a driver shall work on the day or night shift; to say which car he shall drive if he operates company owned cars; to require that the company's insignia and telephone number be placed on all individually owned and operated cars; to require that drivers purchase all of their gasoline from the company, and, in addition, that drivers of individually owned cars buy all of their oil from it; to require that drivers operate only within the city limits, and not go outside; to require that they telephone the main office hourly giving their whereabouts; to require that they maintain a good record for accidents; to require that they be courteous to customers; and to require that they be presentable in their personal appearance. It has the right of discharge for the violation of infraction of these several requirements; and it has the right to promulgate rules from time to time, and to discharge drivers for the violation of them. These rights of direction and control are substantial, and they relate to the method and means of performing the service, not solely to the results. While they do not extend to every feature of the work, they certainly constitute a substantial degree of authoritative control in the method and manner of conducting the business. Appropriate application of the principles to which reference has been made leads to the conclusion that the several taxicab drivers were not independent contractors; that instead, the relationship existing between the company and the drivers was that of employer and employee . . . .

*Jones v. Goodson*, 121 F.2d 176, 180 (10th Cir. 1941). For more recent decisions delineating the factors to be considered in making the determination whether someone is an employee or an independent contractor for purposes of the employment tax provisions see *Avis Rent A Car System, Inc. v. United States*, 503 F.2d 423, 428–29 (2d Cir. 1974); *Air Terminal Cab, Inc. v. United States*, 478 F.2d 575 (8th Cir.), *cert. denied*, 414 U.S. 909, 94 S.Ct. 228, 38 L.Ed.2d 146 (1973); *American Consulting Corp. v. United States*, 454 F.2d 473 (3d Cir. 1971); *McCormick v. United States*, 531 F.2d 554,

209 Ct.Cl. 331 (1976). *See also* Restatement (Second) of Agency § 220 (1958).

In *International Exterminator Corp. v. United States*, 305 F.Supp. 676 (N.D.Tex. 1969), the court held that pest control operators were independent contractors, since each operator serviced his customers without supervision and direction, worked when, where and how he chose to work, selected his own chemicals and methods, owned his own motor vehicle and carried his own insurance thereon, and hired and discharged his own help without the prior knowledge, consent or approval of the company. *Id.* at 679. *Merchant v. Texas*, 379 S.W.2d 924 (Tex.Civ.App.1964), held that persons doing extermination work were employees for purposes of Texas unemployment compensation taxes. However, two of the three classes of workmen involved in *Merchant* received fixed salaries. Furthermore, as to those who did not, the company made all basic decisions, what equipment would be used, the chemicals to be applied, the prices to be charged, what advertising would be done, what insurance would be carried, and how deferred payments would be carried. *Id.* at 925.

 Applying the common law standard of the employment tax provisions of Subtitle C of the Internal Revenue Code of 1954, as amended and in force during the periods involved in this action, see I.R.C. §§ 3121(d), 3306(i), 3401(c), in accordance with the foregoing authorities to the facts involved in the case at bar, the court concludes that the telephone solicitors and the two salaried exterminators were employees of the taxpayer. Although plaintiff adduced some evidence which suggests that the lady solicitors were independent contractors, the overwhelming weight of evidence shows that they were not. They were employees. While all of the evidence does not point in one direction the court has no difficulty in concluding that a clear cut preponderance of the evidence shows and the court concludes that the exterminators other than the two who received a salary, were independent contractors and were not employees of plaintiff.

4. Plaintiff's failure to timely deposit the employment taxes with respect to the solicitors and the two salaried exterminators was due to reasonable cause and not due to willful neglect within the meaning of section 6656(a) of the Internal Revenue Code of 1954, as amended and in force during the periods in controversy. Accordingly, the penalty prescribed by section 6656(a) cannot be imposed upon the plaintiff.

5. The parties are directed to compute the tax liability resulting from this decision and prepare a form of judgment in conformity therewith for submission to the court within thirty days.