In re ASSOCIATED BICYCLE SERVICE, INC., Debtor.

ASSOCIATED BICYCLE SERVICE, INC., Plaintiff,

v.

UNITED STATES of America the COMMISSIONER OF the INTERNAL REVENUE SERVICE, Defendant.

Bankruptcy No. 88–61426.
Adv. No. 89–6149.

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division at Gary.

Sept. 25, 1990.

Wm. O'Toole, Michigan City, Ind., for plaintiff.

Mark Winer, U.S. Justice Dept., Washington, D.C., for defendant.

MEMORANDUM OPINION AND ORDER ON MOTION FOR SUMMARY JUDGMENT BY DEFENDANT

KENT LINDQUIST, Chief Judge.

I

*Statement of Proceedings*

This adversary proceeding came before the Court on a Motion for Summary Judgment filed by the Defendant on July 5, 1990.

By Order of this Court dated July 13, 1990, the Plaintiff was given 15 days to file a response or answer to said motion and upon so doing the Defendant was granted 7 days to file a reply thereto.

On September 5, 1990, the Plaintiff filed its Objection and Answer to Motion for Summary Judgment, with accompanying Statement of Material Facts and Memorandum of Law.

The Plaintiff's complaint filed on September 21, 1989, pursuant to 11 U.S.C. § 505 alleges as follows:

1. Associated Bicycle Service, Inc. (hereinafter "ABS") petitioned for relief under Chapter 11 of Title 11 U.S.C. on September 1, 1988; whereupon a 341 meeting was held on October 7, 1988.

2. ABS is in the business of assembling bicycles for major department stores and retail outlets.

3. As the situses of assembly are spread throughout the Midwest, ABS engages whomever it can find to assemble the bicycles.

4. The work force varies from site to site, is not engaged for more than one site, or for one occasion (that is, for one definite period during which the bikes must be assembled).

5. Each person so engaged brings his own tools, furnishes his own transportation to the worksite, and is unsupervised when he/she performs the assembly.

6. There is no uniform pay or work period, such as a week, two weeks, a month, a year.

7. ABS advertises or announces, or otherwise "spreads the word" when there are other assemblies to be done, and where they are to be done.

8. The period of association between any member of the workforce and ABS varies greatly, from one (1) job to many, over three (3) to six (6) months.

9. Until required by an operating order of this Court, ABS had not acquired workmen's compensation insurance

for its workforce, thinking it to be the province and responsibility of each workman.

10. The retail outlets pay ABS directly for assembly services, and ABS in turn pays its workforce, sometimes according to an hourly schedule, sometimes according to a per-unit schedule.

11. ABS has been in business since 1982. With the exception of the early period, ABS has submitted to an employer status—on admonition from the Indiana Department of Employment Security—paying its workforce as employees rather than as independent subcontractors, or, perhaps more accurately, as a clearing house or union hall might summon or find work for its members.

12. For all the years that ABS operated as an employer, it contracted liability for employer's contributions to each "employee's" FICA. ABS also took on the responsibility for income tax withholding.

13. Such responsibilities as are given in paragraph 12 above are not consistent with ABS' true role or operating profile, which is that of an independent contractor engaging independent subcontractors for piecemeal work at random times in unpredictable places.

14. ABS has accumulated an enormous liability for unpaid employer contributions, a problem compounded by parity penalties and sizeable interest fixments.

15. ABS cannot effectively reorganize without a determination that ABS is not an "employer" as this term is understood in the Internal Revenue Code, Title 26 U.S.C.

16. If ABS is not an "employer", then it is absolved from employer contributions to FICA, and the money which it should have withheld and paid to the IRS becomes an obligation the priority of whose status may be treated at some later date (perhaps in the debtor's plan), but which, in any event, is owed, not to the IRS, but to the subcontractors who contracted with it.

17. ABS *is* capable of formulating a plan which can repay former elements of the workforce their appropriate share of what from their pay had been withheld.

18. No amount of tax herein disputed has hitherto been contested by any court of competent jurisdiction (11 U.S.C. § 505(a)(2)); and this Court has jurisdiction over this matter by dint of 11 U.S.C. § 505(a)(1).

The Plaintiff prays for a judgment determining that as to its pre-petition and post-petition tax obligations it be adjudicated a "contractor" and not an "employer" as those terms are understood pursuant to the Internal Revenue Code, Title 26 U.S.C.; that it be granted leave to amend all Forms 941, and pay all its workforce on Form 1099, rather than Form W–2, and that the Plaintiff be found exempt from "employer" contributions for FICA purposes for all relevant years.

## II

### Conclusions of Law and Discussion

#### A

##### General Principles Relating to Summary Judgment

No objections were made by the parties to the jurisdiction of this Court and the Court finds this is a core proceeding pursuant to 28 U.S.C. § 157.

The granting of a motion for summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

The moving party, in making a motion for summary judgment, "has the burden of establishing the lack of a genuine issue of material fact." *Big O Tire Dealers, Inc. v. Big O Warehouse*, 741 F.2d 160, 163 (7th Cir.1984); *Korf v. Ball State University*, 726 F.2d 1222, 1226 (7th Cir.1984).

■ When ruling on a motion for summary judgment, inferences to be drawn from underlying facts contained in such materials as attached exhibits, and depositions must be viewed in a light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *See also, Yorger v. Pittsburgh Corning Corp.*, 733 F.2d 1215 (7th Cir. 1984).

■ By entering a summary judgment for a party, the court is concluding that based on the evidence upon which the non-moving party intends to rely at trial, no reasonable jury could return a verdict for the non-moving party. *Munson v. Friske*, 754 F.2d 683, 690 (7th Cir.1985); *Weit v. Continental Illinois National Bank & Trust Co.*, 641 F.2d 457, 461 (7th Cir.1981), *cert. den.*, 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982).

■ Once a moving party has met its initial burden, the opposing party must "set forth specific facts showing that there is a genuine issue for trial" and that the disputed fact is material. *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.1983), *cert. den.*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). Thus, if the movant carries his initial burden, the opposing party may not defeat the motion by merely relying on the contentions of its pleadings, but must produce significant probative evidence to support its position. *First National Bank v. Cities Service Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *United States v. Pent–R Brooks, Inc.*, 538 F.2d 519 (2nd Cir.1976), *cert. den.* 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582 (1977).

■ As noted by the Court in the case of *Federal Deposit Insurance Corp. v. Meyer*, 781 F.2d 1260 (7th Cir.1986), a response is insufficient to raise a genuine issue of material fact if it is not based on the personal knowledge of the affiant, and where affiant alleges to be without information to admit or deny the allegations contained in the Movant's affidavit, and demands strict proof thereof, at best the response asserts a mere suspicion or theoretical question of fact that is insufficient to raise a genuine issue of fact.

In addition, General Rule 11 as made applicable by Local Bankruptcy Rule B–111 provides as follows:

In determining the motion for summary judgment, the court will assume that the facts as claimed by the moving party are admitted to exist without controversy, except as and to the extent that such facts are actually in good faith controverted in the "statement of genuine issues" filed in opposition to the motion, as supported by the depositions, answers to interrogatories, admissions, and affidavits on file.

In *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir. 1987), the Seventh Circuit addressed exactly what a party must demonstrate to show the existence of a genuine issue of fact precluding summary judgment. The Court stated:

A genuine issue for trial only exists when there is sufficient evidence favoring the nonmovant for a jury to return a verdict for that party. As the Supreme Court has stated, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." We must not weigh the evidence. Instead, we must see if the nonmovant's evidence is sufficient. In determining whether evidence is sufficient, we must of necessity consider the substantive evidentiary standard of proof, for example, preponderance of the evidence, that would apply at a trial on the merits. In addition, we draw all inferences in favor of the nonmovant. Such inferences, however, must be "justifiable". (Citations and footnote omitted).

■ In reaching its determination, the Court has the power to penetrate the allegations of fact in the pleadings and look to any evidential source to determine whether there is an issue of fact to be tried. *Parmelee Transportation Co. v. Keeshin*, 292 F.2d 794 (7th Cir.1961).

■ The Seventh Circuit in *Egger v. Phillips*, 710 F.2d 292, 296 (7th Cir.1983)

(en banc) *cert. den.* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983), held that to preclude a summary judgment, the non-moving party must show the disputed fact to be material. That is, it must be out-come-determinative under applicable law. Thus, facts not outcome-determinative under applicable law, though in dispute, may permit the entry of a summary judgment. In *Mintz v. Mathers Fund, Inc.*, 463 F.2d 495, 498 (7th Cir.1972), the Court stated that, "appellate courts should not look the other way to ignore the existence of the genuine issues of material facts, but neither should they strain to find the existence of genuine issues where none exists." *See also, Kirk v. Home Indemnity Company*, 431 F.2d 554 (7th Cir.1970).

### B

### *Materials to be Considered on Motion for Summary Judgment*

Federal Rules of Civil Practice 56(c) provides as follows:

(c) Motion and Proceedings Thereon. The motion shall be served at least 10 days before the time fixing for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.* A summary judgment, interlocutory in character may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages. (Emphasis added).

Thus, pursuant to Fed.R.Civ.P. 56(c) the Court may consider all papers of record as specified therein. *Federacion de Empleadas Del Tribunal General de Justicia v. Torres*, 747 F.2d 35 (1st Cir.1984); *Allen v. Carlotti*, 400 F.Supp. 1037 (S.D.Fla.1975), *aff'd.*, 552 F.2d 1086 (5th Cir.1977).

The Court is obligated to consider not only materials specifically offered in support of the motion, but also all "pleadings, depositions, answers to interrogatories and admissions" properly on file and thus properly before the Court. *Smith v. Hudson*, 600 F.2d 60 (6th Cir.1979), *cert. dismissed*, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415. Rule 56 does not distinguish between documents merely filed and those singled out by counsel for special attention; the Court must consider both before granting a summary judgment. *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406 (5th Cir.1980).

The material considered by the Court must be of the type that would be admissible in evidence. Federal Rule of Civil Procedure 56(e) provides in part as follows:

(e) Form of Affidavits; Further Testimony; Defense Required. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.

■ Inasmuch as the summary judgment procedure lacks the safeguards of cross-examination of the affiant, it must be shown that he is competent to testify as to the matters stated, and the facts to which he swears are admissible in evidence. *American Securit Co. v. Hamilton Glass Co.*, 254 F.2d 889 (7th Cir.1958); *Midland Engineering Co. v. John A. Hall Constr. Co.*, 398 F.Supp. 981 (N.D.Ind.1975).

■ An affidavit that does not measure up to the standards of Fed.R.Civ.P. 56(e) is subject to a motion to strike, but formal defects are waived in absence of a motion or other objection. *Noblett v. General Electric Credit Corp.*, 400 F.2d 442 (10th Cir.1968) *cert. den.* 393 U.S. 935, 89 S.Ct. 295, 21 L.Ed.2d 271; *Auto Drive–Way Co. v. I.C.C.*, 360 F.2d 446 (5th Cir.1966); *Klingman v. National Indemnity Co.*, 317 F.2d 850 (7th Cir.1963). In the absence of such a motion or objection an affidavit not

in compliance with Fed.R.Civ.P. 56(e) may be considered. *Id.*

As a general rule affidavits of opinion or legal conclusions submitted in connection with a motion for summary judgment are totally ineffectual and are not to be given any weight whatever. *G.D. Searle & Co. v. Chas. Pfizer & Co.*, 231 F.2d 316 (7th Cir.1956) (decided prior to effective date of Fed.Rules of Evid.); *see Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627–28, 64 S.Ct. 724, 728–29, 88 L.Ed. 967 (1944). However, the fact that an affidavit in support of a motion for summary judgment contains conclusions as to the meaning of a particular statute does not necessarily make it inadmissible under Fed.R.Civ.P. 56(e) as being an opinion on an ultimate issue since the ultimate issue rule was abolished by Fed.R.Evid. 704, and opinion testimony that would be admissible at trial may be submitted by affidavit. The fact that an interpretation given in an affidavit was *post litem mortam* may detract from its persuasive force, but that defeat goes to weight and not admissibility. *Case & Co. v. Board of Trade*, 523 F.2d 355 (7th Cir.1975). Affidavits do not qualify as a basis for summary judgment, and are not competent for the purpose of negating genuine issues of material fact where matters of motive or opinion of value are involved. *Duane v. Altenburg*, 297 F.2d 515 (7th Cir.1962). Mere conclusory affidavits that an issue exists will not suffice to defeat well-grounded motions for summary judgment. *Wilson Jones Co. v. Gilbert & Bennett, Mfg. Co.*, 332 F.2d 216 (2nd Cir.1964).

In ruling on a motion for summary judgment the Court can properly disregard an affidavit that contains only inadmissible hearsay. *Leonard v. Dixie Well Service & Supply, Inc.*, 828 F.2d 291 (5th Cir.1987); *Rossi v. Trans World Airlines Inc.*, 507 F.2d 404 (9th Cir.1974); *Turoff v. May Co.*, 531 F.2d 1357 (6th Cir.1976). An affidavit not based on personal knowledge is insufficient to support a motion for summary judgment. *Hummel v. Wells Petroleum Co.*, 111 F.2d 883 (7th Cir.1940). The trial court can disregard an affidavit based on information or belief regardless of the opponents failure to object to such an affidavit. *City Federal Sav. & Loan Assn. v. Federal Home Loan Bank Board*, 600 F.2d 681 (7th Cir.1979).

On a motion for summary judgment the Court should disregard only the inadmissible portion of the affidavit and is free to consider the admissible portions. *Lee v. National Life Assur. Co.*, 632 F.2d 524 (5th Cir.1980), *reh. den.* 635 F.2d 516 (1981), *United States v. Alessi*, 599 F.2d 513 (2nd Cir.1979). In *Cohen v. Ayers*, 449 F.Supp. 298 (N.D.Ill.1978), *aff'd.* 596 F.2d 733 (7th Cir.1979), it was held that an affidavit may be disregarded if it contains conclusions of law or of ultimate fact, statements made on information and belief, or argument, but that if admissible facts and inadmissible statements are mingled in the same affidavit, the Court may rely on the facts and disregard the rest. The Court is free to disregard the inadmissible argument or conclusions in an affidavit of support whether or not a motion to strike is filed. *Prudential Ins. Co. v. Curt Bullock Builders, Inc.*, 626 F.Supp. 159 (N.D.Ill. 1985).

Supporting Memorandum, not sworn or in affidavit form making factual assertions, even if accompanied by exhibits does not meet the requirements of Rule 56(c), and cannot be relied upon by the Court as establishing a basis for summary judgment. *Macklin v. Butler*, 553 F.2d 525 (7th Cir.1977); *Smith v. Mack Trucks, Inc.*, 505 F.2d 1248 (9th Cir.1974); *Goldman v. Summerfield*, 214 F.2d 858 (D.C. Cir.1954).

The Court in ruling on the motion for summary judgment has considered the following documents that have been filed of record: Deposition of John Wilson taken by the Defendant and filed by the Defendant on July 11, 1990, the Deposition of James Wilson, Jr. filed by the Defendant on July 11, 1990, and the Deposition of Darrell Sanders filed by the Defendant on July 11, 1990. All of these depositions were ordered published by the Court on August 13, 1990 for its consideration in ruling on the Defendant's Motion for Summary Judgment.

## C

### *Standard of Proof to be Applied on Motion for Summary Judgment*

 Finally it should be noted that the Supreme Court in the case of *Anderson, et al. v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), held that in determining whether a factual dispute exists on a motion for summary judgment, the court must be guided by the substantive evidentiary standards of the case that are applicable at trial, and thus in ruling on a motion for summary judgment the Supreme Court held that the court must apply the clear and convincing standard in a case where the actual malice rule applied, and this was thus the standard of proof for such a claim. Here the standard of proof as to the determination of the status of the assemblers is by a preponderance of the evidence. *Carson v. United States*, 560 F.2d 693 (5th Cir.1977) (Burden of persuasion and presumption of correctness that attends Commissioner's assessments combine to require that a taxpayer always prove by a preponderance of the evidence that the Commissioner's determination was erroneous; the burden applies where the proceeding is in the tax court for a redetermination of the deficiency or in the district court upon a claim for refund or a government counterclaim); *Estate of Whitt v. Commission*, 751 F.2d 1548 (11th Cir.1985) *cert. denied* 474 U.S. 1005, 106 S.Ct. 523, 88 L.Ed.2d 456 (taxpayer must overcome the presumption of correctness of the assessment and the facts supporting the assessment by a preponderance of the evi-dence); *U.S. v. Paladin*, 539 F.Supp. 100 (W.D.N.Y.1982) (burden is on the taxpayer to prove by a preponderance of the evidence that the assessment is incorrect); *Lieb v. United States*, 438 F.Supp. 1015 (E.D.Okla.1977) (company did not establish by a preponderance of the evidence that the individuals were not employees within the intention of the Internal Revenue Code).

Thus, the court must apply the preponderance of the evidence standard of proof to the Plaintiff in this adversary proceeding in testing the sufficiency of the government's motion for summary judgment because the presumption of correctness attaches to the assessment of the Commissioner.

As a general rule the Internal Revenue Service as a creditor has the ultimate burden of persuasion and must prove its claims by a preponderance of the evidence. *See In re Aulicino*, 48 B.R. 252 (Bankr.D. Conn.1985); *In re Sepco, Inc.*, 36 B.R. 279 (Bankr.D.S.D.1984); *In re WHET, Inc.*, 33 B.R. 424 (Bankr.Mass.1983). *See also,* Bankruptcy Rule 9017 which states that the Fed.R.Evid. and Rules 43, 44 and 44.1 Fed.R.Civ.P. apply in cases under the Code. Fed.R.Evid. 301 states that a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof or risk of non-persuasion which remains throughout the trial upon the party on whom it was originally cast.[1]

---

1. Fed.R.Evid. 301 provides as follows:

 **Rule 301. Presumptions in General in Civil Actions and Proceedings**

 In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of non-persuasion, which remains throughout the trial upon the party on whom it was originally cast.

 Presumptions of fact have been created to assist in certain circumstances where direct proof of a matter is for one reason or another rendered difficult. They arose out of considerations of fairness, public policy, and probability, and are useful devices for allocating the burden of production of evidence between the parties. However, derived as they are from considerations of fairness and policy, they must not be given mechanical application. *Panduit Corp. v. All States Plastic Manufacturing Company*, 744 F.2d 1564 (Fed.Cir.1984).

 The effect of a presumption of fact is to place upon the opposing party the burden of establishing the non-existence of that fact; however the burden on the opposing party is limited to the production of evidence, and the burden of persuasion on the existence of the presumed fact remains throughout on the party invoking the presumption. *Id.*

 A presumption does not enjoy the status of evidence. If a finding on the evidence is made that a presumed fact has been effectively rebut-

However, it is well established that a presumption of correctness attaches to any federal tax assessment, and the burden rests with the taxpayer to present evidence sufficient to overcome that presumption by countervailing proof. *Ruth v. United States*, 823 F.2d 1091 (7th Cir.1987); *Psaty v. United States*, 442 F.2d 1154, 1158–59 (3rd Cir.1971); *Sinder v. United States*, 655 F.2d 729, 731 (6th Cir.1981); *United States v. Garm*, 114 B.R. 414 (Bankr.M.D. Pa.1990). After the introduction by the government of its assessment which is presumptively correct, the burden shifts to the taxpayer and if the taxpayer rebuts the presumption, it disappears, in which case the burden of proving the deficiency then reverts to the government. *U.S. v. Stonehill*, 702 F.2d 1288 (9th Cir.1983) *cert. denied*, 465 U.S. 1079, 104 S.Ct. 1440, 79 L.Ed.2d 761 (1984). Federal tax assessments are presumptively correct and establish prima facie case of liability for the payment of the tax as assessed. *U.S. v. Waite, Inc.*, 480 F.Supp. 1235 (W.D.Pa. 1979). A "Certificate of Assessment and Payment" under seal of the Director of the IRS is self authenticating under Fed.R. Evid. 902(1), and no extrinsic evidence is necessary. (1), *Garm*, 114 B.R. at 915.

Applying these concepts to the case *sub judice*, the burden of establishing that the workers were independent contractors is on the Plaintiff since the IRS had filed a proof of claim which showed that the assessment came from the Debtor's returns. *Beatty v. Halpin*, 267 F.2d 561 (8th Cir.1959); *Chase Mfg. Inc. v. United States*, 446 F.Supp. 698 (E.D.Mo.1978). The issue as to whether an employer-employee relationship exists for employment tax purposes is fact intensive.

ted, the presumed fact ceases to exist. It does not linger on to be weighed against the evidence. If evidence is provided which falls short of meeting the threshold of rebuttal, the presumed fact retains its validity. Hence, the standard to establish the nonexistence of the presumed fact may be critical. *Id. See e.g., Freeman v. Chicago Musical Instrument Company*, 689 F.2d 715 (7th Cir.1982) (In a disqualification proceeding, attorney had burden of "clearly and effectively" rebutting the presumption).

When a presumption shifts the burden of going forward with the evidence, and no evidence is produced rebutting the presumption, the Court is required to draw the inference as a matter of law. *United States v. Ahrens*, 530 F.2d 781 (8th Cir.1976).

Federal Procedure, Lawyer's Edition in discussing Fed.R.Evid. 301 states as follows:

Under FRE 301, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption. FRE 301 makes it explicit that a presumption does not shift the burden of proof or the burden of persuasion on a particular issue. The burden remains throughout the trial upon the party on whom it was originally cast. The burden of going forward to rebut the presumed fact is imposed once the asserting party establishes the basic facts underlying the presumption. In declaring the effect of a true presumption in terms of the burden of going forward with evidence to rebut, FRE 301 does not render a presumption evidence in and of itself, but rather merely prescribes a method for dealing with evidence.

\*　　\*　　\*　　\*　　\*　　\*

The use by a court of a procedural presumption as to fraud, bad faith, or grossly mistaken judgment, in order to shift to the defendant the burden of going forward with exculpatory evidence, does not, under FRE 301, shift the burden of proof which rests with the plaintiff with respect to those issues, unless a shift is dictated by an independent rule of law.

12 Fed.Proc.Lawyers Ed., *Evidence*, § 33.93 (Footnotes Omitted).

As to the effect of introducing or failing to introduce evidence to rebut the presumption that same treatise states as follows:

Under FRE 301, Congress intended that a presumption would be sufficient to overcome a motion to dismiss made at the end of a party's case in chief. Where the party against whom a presumption operates produces no evidence rebutting the presumption, summary judgment may be granted in favor of the party asserting the presumption, and in a nonjury civil case, a judge is required to find the presumed fact as a matter of law.

It has been observed that FRE 301 reflects the so-called "bursting bubble" theory, under which a presumption vanishes from a case upon the introduction of evidence which would support a finding of the nonexistence of the presumed fact. Thus, upon a finding that the presumed fact has been effectively rebutted, the presumed fact ceases to exist and does not linger to be weighed against other evidence as a presumption, does not enjoy the status of evidence, and has no probative effect once rebutted.

*Id.* at § 94.

*Air Terminal Cab, Inc. v. United States,* 478 F.2d 575, 578 (8th Cir.1973) *cert. denied* 414 U.S. 909, 94 S.Ct. 228, 38 L.Ed.2d 146 (1973); *McGuire v. United States,* 349 F.2d 644, 646 (9th Cir.1965); *Saiki v. United States,* 306 F.2d 642, 648 (8th Cir.1962); *Morish v. United States,* 214 Ct.Cl. 166, 555 F.2d 794, 796 (1977);. The resolution of this issue is to be determined in light of the total context before a court in a particular situation. *United States v. Silk,* 331 U.S. 704, 719, 67 S.Ct. 1463, 1471, 91 L.Ed. 1757 (1947).

D

*Summary of the Evidence*

The Depositions of John Wilson, James Wilson and Darrell Sanders filed by the Defendant in support of its Motion for Summary Judgment revealed the following uncontested and undisputed material facts upon which there is no genuine issue as alleged by the Defendant in its statement of material facts filed with the court July 5, 1990:

1. James E. Wilson was president of Associated Bicycle Service (ABS) between 1982 and 1989. (James Wilson Deposition Transcript, pages 4 and 5).

2. ABS was in the business of assembling bicycles, as well as other items, such as swing sets, gas grills, lawn and garden furniture and boxed furniture. (James Wilson Deposition Transcript, pages 6 and 7).

3. ABS assigned workers to perform this service at its customer's department stores. Its customers included, among others, Service Merchandise, Zayres, K–Mart and Venture. (James Wilson Deposition Transcript, pages 6 and 7).

4. ABS performed its services primarily in Northern Illinois, Indiana and Southern Wisconsin. (James Wilson Deposition Transcript, page 8).

5. Between 1982 and 1984 James Wilson worked in the field as an assembler, but throughout the existence of ABS, his primary responsibilities were selling ABS's services to customers and insuring the quality of the work performed by ABS assemblers. (James Wilson Deposition Transcript, pages 7 and 16, Exhibit No. 3).

6. John W. Wilson is James Wilson's brother. He founded ABS in June 1979, but left the company in January, 1983 to work in Texas. He returned to part-time employment with ABS in August, 1983. He resumed full-time employment with ABS in the spring of 1986. (John Wilson Deposition Transcript, pages 5, 9, 10, and 15).

7. ABS, according to James Wilson, began to treat its workers as employees for federal tax purposes in June, 1982, upon the advice of its accountant, Richard Ondrovich, immediately after he hired the accountant. (James Wilson Deposition Transcript, page 8).

8. ABS began to treat its employees as independent contractors for federal tax purposes in October, 1985 because the company was losing money and James Wilson decided, after consulting with an attorney, to change the status of the workers to independent contractors, for federal tax purposes, by adopting an employment and independent contract agreement. (James Wilson Deposition Transcript, pages 23, 24, Deposition Exhibit 4).

9. Following this change, workers were required to sign an agreement captioned "Employment Agreement Independent Contractors". This agreement contained a noncompetition clause. (James Wilson Deposition Transcript, pages 23 and 24 and Deposition Exhibit No. 4, paragraph 9).

10. ABS returned to treating its workers as employees for federal tax purposes in October, 1987, based on the instructions of the Indiana Unemployment Security Division. During all periods when workers were treated as employees for federal tax purposes, ABS withheld

taxes and social security contributions from the workers' wages and provided workers with W–2 wage and withholding statements at the end of the year. (James Wilson Deposition Transcript, pages 25 and 29).

11. ABS ran its operation the same way, regardless of whether the workers were considered independent contractors or employees, except that it withheld taxes from the salaries of the workers when they were being treated as employees and did not withhold taxes from the salaries of the workers when they were being treated as independent contractors. (James Wilson Deposition Transcript, page 27, John Wilson Deposition Transcript, page 40, 71).

12. As a general rule, the assemblers, when they began to work for ABS, were required to purchase tools required to perform their work, and at times ABS would sell special tools required for the repair of bicycles to the workers. (James Wilson Deposition Transcript, page 33).

13. As a general rule, the assemblers were paid on a commission basis and paychecks were issued twice a month, from 1985 through 1989. (James Wilson Deposition Transcript, page 14).

14. The commissions were calculated as a percent of the total ABS charged its customers for work performed by its workers. (James Wilson Deposition Transcript, page 19, John Wilson Deposition Transcript, page 50).

15. Workers were reimbursed for their travel expenses, based on the mileage they drove to and from work sites. (James Wilson Deposition Transcript, page 19).

16. James Wilson assigned specific workers to work sites each day based on his perception of the worker's ability to handle the assemblies required by the ABS customers.

(James Wilson Deposition Transcript, page 9).

17. ABS usually required the workers to report to the office each morning at 8:00 a.m. to receive their assignments, instructions on new products, directions to the stores, the name of the store manager that the worker needed to contact and invoices showing the customer orders. (James Wilson Deposition Transcript, page 40, John Wilson Deposition Transcript pages 22, 51–55).

18. ABS monitored the number of assemblies and repairs its workers performed for its customers by requiring the workers to complete worksheets showing the work is performed. These worksheets, along with invoices signed by the customer, would be submitted to ABS at the end of each business day or at the meeting the following morning. (James Wilson Deposition Transcript pages 12–14, John Wilson Deposition Transcript pages 27–30).

19. ABS maintained control over which workers went to particular worksites and when they would go. (John Wilson Deposition Transcript page 61).

20. John Wilson oversaw the training of new workers, when he was with ABS. He would show them how to assemble the various items that ABS customers sold that required assembly. Training a new employee took between three weeks to six months depending on the types of items that the trainee was to assemble and his prior experience. (John Wilson Deposition Transcript pages 17–21).

21. Training continued, after the initial phase, by pairing a new worker with a more experienced worker. (John Wilson Deposition Transcript, page 21, Darrell Sanders Deposition Transcript page 14).

22. The assemblers never hired their own assistants. (John Wilson Deposition Transcript, page 58).

23. Generally, a core group of workers stayed with ABS through each season. For example, during 1987 there were about 15 to 17 workers that stayed with ABS during the entire busy season. (James Wilson Deposition Transcript, page 21).

24. Workers were generally required to report to the ABS office at 8:00 a.m. each day to receive their assignments and to go to the assigned worksite from the ABS office. They were also asked to turn in their completed worksheets and invoices at the end of each work day, or no latter than the beginning of the following day. (John Wilson Deposition Transcript, page 50–55 and 61–62).

25. Workers were expected to work full-time, six days a week if, necessary. (John Wilson Deposition Transcript, page 61).

26. The assembly work was always performed at the customer's retail store, never at the worker's home. (John Wilson Deposition Transcript, page 61).

27. The workers were sometimes required to follow the store manager's directions in scheduling the work. For example, the workers were often required to repair items that were returned by customers before doing assemblies. (John Wilson Deposition Transcript, page 61).

28. ABS reimbursed workers for their travel expenses at the rate of sixteen cents per mile. (John Wilson Deposition Transcript, page 62).

29. The only investment the worker had was in the tools that he had to purchase. The value of these tools was about $300.00. A good worker could earn $200.00 in a day. (John Wilson Deposition Transcript, pages 66–67).

30. The worker has no opportunity to realize a profit or a loss aside from the wages he was paid. (John Wilson Deposition Transcript, pages 67–68).

31. The workers do not work for other employers in this business. (John Wilson Deposition Transcript, page 68).

32. The workers do not advertise their services or provide their services to the general public, although they may do bicycle or other assemblies for neighbors. (John Wilson Deposition Transcript, page 68–69).

33. ABS retained the right to discharge its workers. (John Wilson Deposition Transcript, pages 69–70, Deposition Exhibit 4, paragraph 7).

34. A worker had the right to end his or her relationship with ABS at any time. (John Wilson Deposition Transcript, page 70).

35. The written "Employment Agreement Independent Contractors" between ABS and its workers has the employee agree to: "comply with the goals, guidelines, directives, position description, policies, and procedures now or at some later date established or approved by A.B. Services." (Deposition Exhibit 4, paragraph 3).

The Plaintiff's Statement of Material Facts, filed on September 5, 1990, basically incorporated the Statement provided by the Defendant, and set forth *supra*, with the following additional notations:

2. James E. Wilson, Jr. ("Jim") developed a different attitude toward the assemblers, once they were transferred from 1099s to w–2s. (This is the distinction of fact between § 11 of defendant's recital and plaintiff's) [Jas. Wilson dep. @ 26].

3. There was a large (and fast) attrition rate among the people hired by ABS, some not lasting more than a week. [Jas. Wilson dep. @ 9; John Wilson dep. @ 74].

4. The assemblers would seek work every day they wanted to work [Jas. Wilson dep. @ 10–11].

5. There was no certain time of day to call in regarding inquiries of new jobs [Jas Wilson dep. @ 11].

6. There was little if any supervision over the assemblers, since ABS "wasn't equipped" [Jas. Wilson dep. @ 16]; there was no way to monitor the hours worked [John Wilson dep. @ 49].

7. The assemblers engaged in "reverse estimation", filling out a production sheet at the end of a day, in order to show what profit they made—profit based not simply on *piece-work*, but variations of items assembled [Jas. Wilson dep. @ 12].

8. As an example of the change in attitude toward the assemblers, now that they were consigned to 1099s: the assemblers now had to buy their own tools, whereas when on W–2s tools were furnished them [Jas. Wilson dep. @ 33].

9. The profit an assembler could realize was directly proportional to the number of items which he could assemble. [Jas. Wilson dep. @ 17].

10. All assemblers had to provide their own vehicle: "none were supplied"; if they wanted uniforms, they had to pay for them themselves [Jas. Wilson dep. @ 34].

11. What to assemble and how is "strictly up" to the assemblers [John Wilson dep. @ 62]; the assemblers determined what to assemble and when: they had the power to negotiate with the store what requests to handle first [Jas. Wilson dep. @ 42].

12. ABS did not enforce any non-compete clause which it intercalculated in its employment agreements [Jas. Wilson dep. @ 49].

13. Jim can't say for certain that the assemblers worked elsewhere [Jas. Wilson dep. @ 39]; John knows that they're all working on bikes on the side [John Wilson dep. @ 69].

14. John is especially sensitive to assemblers soliciting stores for themselves [John Wilson dep @ 46].

15. John Wilson himself began ABS by soliciting stores directly, and apart from the Joe Nolan organization which had the original understanding with the store—John demonstrated in 1982 the paradigm of the independent assembler to contract with customers directly [John Wilson dep. @ 7].

16. Jim doesn't rule out the probability that assemblers *qua* independent contractors could make a profit over and above what ABS was constrained to give them by way of commission [Jas Wilson dep. @ 48].

17. Before making any adjustment from W–2 to 1099 or *vice-versa*, Jim sought a lawyer's advice [Jas. Wilson dep. @ 22–23]; ABS' accountant was at every pertinent moment informed of all intended employment status changes— "he knew what we were doing" and confided the propriety of the transformation to both his attorney and his accountant [Jas. Wilson dep. @ 28, 61].

18. ABS never provided a training manual [John Wilson dep. @ 41]; and while ABS provided a "direction book" (so the assemblers knew how to get where they needed to go), ABS charged each and every one of the assemblers $25.00 for the book [John Wilson dep. @ 41–42].

In addition to the foregoing, the court has considered the following evidence from the deposition of Darrell Sanders filed by the Defendant and published:

1. Individuals reported to the office at 8 o'clock to receive their assignments for the day, directions to the store and any additional information necessary to complete their assignment. [Darrell Sanders Deposition and transcript, pages 7 & 8.].

2. During the six years that Mr. Sanders worked for ABS he was treated as an employee and had regular withholding from his paycheck and received a W–2 at the end of the year. [Darrell Sanders Deposition and transcript, pages 6 & 7].

3. Upon arrival at a store, Mr. Sanders would check in with management for specific instructions about the work to be done. [Darrell Sanders Deposition and transcript, page 8].

4. Mr. Sanders often trained new assemblers on the job for periods sometimes in excess of two weeks. [Darrell Sanders Deposition and transcript, pages 13 & 14].

5. ABS was concerned with the reputation the company had with its customers and on occasion fired individuals who did not meet the company's expectations of behavior at the customers store. [Darrell Sanders Deposition and transcript, pages 14 & 16].

6. ABS reviewed the quality of its assemblers in order to avoid liability for accidents. [Darrell Sanders Deposition and transcript, pages 16 & 17].

7. Mr. Sanders did not do additional work for clients of ABS or maintain an independent operation where he assembled bicycles. [Darrell Sanders Deposition and transcript, pages 21 & 22].

According to the Defendant ABS filed federal tax returns reporting withheld employee income taxes and Federal Insurance Contributions Act (FICA) taxes, but has failed to pay the taxes due, for the fourth quarter of 1986, the second, third and fourth quarters of 1987, the first, second, third and fourth quarters of 1988, and the first, second, third and fourth quarters of 1989. The Internal Revenue Service has made assessments based on these returns.

In addition, the Defendant asserts that ABS filed federal tax returns reporting Federal Unemployment Tax Act (FUTA) taxes, but has failed to pay the taxes due, for 1985, 1988 and 1989. The Internal Revenue Service has made assessment based on these returns.

### E

*Legal Issues to be Decided*

The precise legal issue to be decided is whether the Plaintiff was entitled to treat its workers as independent contractors rather than employees for federal tax purposes.

If the workers are employees, as the Defendant contends, then ABS is liable for Income Withholding and Federal Insurance Contribution Taxes attributable to the compensation paid by ABS to the workers. On the other hand, if the workers are independent contractors, as ABS contends, ABS is liable to its workers for taxes withheld from their compensation, but not paid to the Defendant.

The distinction between an employer-employee relationship and a principal-independent contractor relationship concerns the ability of the Internal Revenue Service to collect amounts due for "withholding type taxes." As the Ninth Circuit Court of Appeals noted in *In re Technical Knockout Graphics, Inc.,* 833 F.2d 797 (9th Cir.1987):

The Internal Revenue Code (Code) provides that taxes required to be deducted by employers from the wages paid to employees under 26 U.S.C. §§ 3102(a) and 3402(a), such as withholding and Social Security taxes, "shall be held to be a special fund in trust for the United States." 26 U.S.C. § 7501(a). The withheld funds are commonly referred to as "trust fund" taxes. *Slodov v. United States,* 436 U.S. 238, 242–43, 98 S.Ct. 1778, 1782–83, 56 L.Ed.2d 251 (1978). "Non-trust fund" taxes are those not collected from employees' wages. Under the Code, the employer is responsible for collecting, and is personally liable for, the trust fund taxes. 26 U.S.C. §§ 3102(a), (b), 3402, 3402, 6672.

If a corporation is unable to pay its trust fund taxes, the United States Treasury suffers the loss because the employees from whose wages the taxes are withheld are still credited with those amounts as if they had in fact been paid to the government. *United States v. Huckabee Auto Co.* 783 F.2d 1546, 1548 (11th Cir.1986); *Sorenson v. United States,* 521 F.2d 325, 328 (9th Cir.1975). Congress has imposed personal liability on any officer or employee of the employer responsible for the collection and payment of trust fund taxes who "willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat such tax or the payment thereof." 26 U.S.C. § 6672. These officers and employees are termed the "responsible persons." This is not true for

non-trust fund taxes. That the funds collected under Section 6672(a) are termed a penalty "does not alter their essential character as taxes." *United States v. Sotelo,* 436 U.S. 268, 275, 98 S.Ct. 1795, 1800, 56 L.Ed.2d 275 (1978). The Internal Revenue Service (IRS) collects the amount of the unpaid trust fund taxes only once, whether collected in part or in whole from each responsible person and/or the corporate employer. *US LIFE Title Ins. Co. v. Harbison,* 784 F.2d 1238, 1243 n. 7 (5th Cir.1986). *Id.* 833 F.2d at 797.

There appears to be no dispute concerning the law which applies to this case. ABS has been assessed for failure to withhold income tax and pay social security taxes on behalf of its workers for the periods ending on December 31, 1986, all periods in 1987, 1988, and the first three quarters of 1989. The IRS's assessment of tax, and penalties in connection with that tax is based on a determination that the workers for ABS were "employees" within the meaning of 26 U.S.C. § 3401 and Treasury Regulations Sections 31.3121(d)–1(c); 31.-3306(i)–1; and, 31.3401(c)–1.

Section 3401 of Title 26 and Treasury Regulation Section 31.3401(c)–1 which implements this section (withholding) are attached hereto as Appendix "A" and "B" respectively.█ Section 3306(i) of Title 26 and Treasury Regulation Section 31.-3306(i)(1) which implements this section (FUTA) are attached hereto as Appendix "C" and "D" respectively.█ Section 3121(d) of Title 26 and Treasury Regulation Section 31.3121(d)–1(c) which implements this section (FICA) are attached hereto as Appendix "E" and "F" respectively.█

█ The Treasury Regulations, in essence, echo the common law tests regarding employee/independent contractor status, and provide that generally the relationship of employer and employee exists when the person or persons for whom the services are performed have the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work, but also as to the details and means by which that result is accomplished.

That is, an employee is subject to the will and control of the employer not only as to what shall be done, but as to how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if the employer has the right to do so. (*See,* Revenue Ruling 87–41, 1987–1 C.B. 296, 298–299, attached hereto as Appendix "C").

Twenty factors or elements have been identified as indicating whether sufficient control is present to establish an employer-employee relationship. The twenty common law factors described in Rev.Rul. 87–41 are:

(1) Instructions;

(2) Training;

(3) Integration;

(4) Services Rendered Personally;

(5) Hiring, Supervising and Paying Assistants;

(6) Continuing Relationship;

(7) Set Hours of Work;

(8) Full–Time Required;

(9) Doing Work on Employer's Premises;

(10) Order or Sequence Set;

(11) Oral or Written Reports;

(12) Payment by Hour, Week or Month;

(13) Payment of Business and/or Transportation Expenses;

(14) Furnishing of Tools and Materials;

(15) Significant Investment;

(16) Realization of Profit or Loss;

(17) Working for More Than One Firm at a Time;

(18) Making Service Available to General Public;

(19) Right to Discharge; and

(20) Right to Terminate.

In defining the relationship, and in drawing a distinction between employees and independent contractors, the Internal Revenue Code's Regulations do no more than

reiterate familiar principles of common law. *Anglim v. Empire Star Mines Co.,* 129 F.2d 914 (9th Cir.1942).

A court must do more than to merely analyze the "economic realities" of the relationship. *Illinois Tri–Seal Products, Inc. v. United States,* 173 Ct.Cl. 499, 353 F.2d 216 (1965). While there is no doubt that the common law is to be relied upon to define the limits of the employer-employee relationship, the Supreme Court's decisions in *United States v. Silk,* 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947) and *Bartels v. Birmingham,* 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947), clearly mandate a broad application of the common law concept of "employee." *Ringling Bros.—Barnum & Bailey Combined Shows, Inc. v. Higgins,* 189 F.2d 865 (2nd Cir.1951).

In *Silk, supra,* the Court stated:

Probably it is quite impossible to extract from the statute a rule of thumb to define the limits of the employer-employee relationship. The Social Security Agency and the courts will find that degrees of control, opportunities for profit or loss, investment in facilities, permanency of relation and skill required in the claimed independent operation are important for decision. No one is controlling nor is the list complete.

331 U.S. at 716, 67 S.Ct. at 1469.

The reference to Common law rules does not imply that the Common-law cases which define the relationship between employees and independent contractors are controlling. *Grace v. Magruder,* 148 F.2d 679 (D.C.Cir.1945) *cert. denied,* 326 U.S. 720, 66 S.Ct. 24, 90 L.Ed. 426. By the phrase "usual common law rules" Congress did not intend that the various common laws of the several states should govern the definition of the employer-employee relationship; this phrase was used for the purpose of establishing a standard for the guidance of Federal Courts in defining this relationship. *Crossett Lumber Co. v. United States,* 79 F.Supp. 20 (W.D.Ark. 1948). In fact, a decision of a state court that the relation of employer-employee did not exist is not controlling on a federal court. *National Campaign Committee v.* *Rogan,* 69 F.Supp. 679 (S.D.Cal.1945). In determining an oil company's liability for social security taxes, a federal court is not bound by *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and thus is not bound by a state court's determination that certain distributors' contracts made by an oil company created a relationship of independent contractor rather than employer-employee; the question in federal court is not the rights and liabilities of the contracting parties, but whether the federal employment taxes are due by the company. *Stuart v. Kleck,* 129 F.2d 400 (9th Cir.1942); *American Oil Co., v. Fly,* 135 F.2d 491 (5th Cir.1943).

 It is clear that there is no single common law test for the determination of the status of an individual and an independent contractor/employee. *Hoosier Home Improv. Co. v. United States,* 350 F.2d 640 (7th Cir.1965). In *Hoosier,* the plaintiff/taxpayer contended that the sole criterion for determining the employer-employee relationship was whether the taxpayer had the right to control the means and method by which the desired result was to be achieved, with the balance of the factors relevant only as they affected the determination of the question of control in a particular case. While the court indicated that the "control or the right to control is the most important criterion", that factor alone is not the sole determinant. *Hoosier,* 350 F.2d at 643. *See also Barrett v. Phinney,* 278 F.Supp. 65 (S.D.Tex.1968); *McGuire v. United States,* 349 F.2d 644 (9th Cir.1965). It is important to note that there is no single common law test of the employer-employee relationship, which may be applied independently of the purpose for which the classification is made. *Hoosier,* 350 F.2d at 643. The burden is on the taxpayer seeking to avoid an employment tax liability to show that he has consistently treated his workers as independent contractors. *In re McAtee,* 115 B.R. 180 (N.D. Iowa 1990).

The taxpayer in *Hoosier* was in the business of the sale and installation of roofing, siding materials, storm windows and doors for frame structures. Hoosier's salesmen

solicited contracts from homeowners, and after Hoosier delivered the material to the job site, the applicators affixed the material to the roofs or walls. The primary issue in the case involved the determination of the status of Hoosier's applicators. In describing the relationship the court noted:

> Applicators were informed by a series of "Important Notices" about the manner in which work had to be done, at the risk of losing the bonus on the job, that they were to call in "collect" on days when they were not working, and that hospitalization insurance was available through a payroll deduction plan. In the case of applicators working more than fifty miles from the company office, Hoosier would pay the hotel bills. A company "expediter" was sent to inspect jobs and see that they were performed in accordance with the contract. If the work was faulty the applicator had to correct the defects without additional compensation. If his work was generally unsatisfactory, an applicator would be offered no more jobs.
>
> The applicators did no advertising and had no business cards. Signs at the job sites identified the work as being done by the Hoosier Home Improvement Company. Applicators were paid weekly, usually on Saturday, on a piecework basis. In some circumstances the price would be negotiated or an hourly basis would be used. On some jobs a small area of the house would be covered with siding as a sample. An applicator would be paid to do this work on an hourly basis, with no assurance that he would do the full siding job.
>
> Only experienced applicators were hired and some of them worked for Hoosier exclusively or for long periods of time. Hoosier's president testified that the applicators did not need detailed supervision and that the company's profit margin did not allow it. They supplied their own tools, which consisted of small hand and power tools costing $400 to $500. They also usually supplied their own transportation, but occasionally they would use Hoosier's trucks.

> Although not required to accept jobs which were offered to them, one of the applicators testified that he was told, not asked, to take the next job, and another one testified that he left Hoosier because he did not know that he could reject jobs. In a letter to one who had left the company, Hoosier's president appealed to company loyalty, pointed out the prospects for continued growth, and asked him to come back to work.

*Id.,* 350 F.2d at 644.

The Court in affirming a jury verdict finding for the government noted:

> The Supreme Court in 1947, because of a lack of decisional uniformity, in defining "employee" under the Social Security Act, decided the cases of *United States v. Silk* and *Harrison v. Greyvan Lines, Inc.,* 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947), and *Bartels v. Birmingham,* 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947), and attempted to furnish broad, general guidelines to courts and agencies in this area. Because of a set of proposed Treasury Department regulations purporting to implement the rule of those cases and subsequent Congressional action in 1948 specifically adding the test of common law rules to the statutes, disagreement arose among the lower federal courts as to whether the Congressional action was designed merely to repudiate the proposed regulations or whether Congress had also repudiated the 1947 Supreme Court decisions. This court took the latter position in *Party Cab Co. v. United States,* 172 F.2d 87–88–91, 10 A.L.R.2d 358 (7th Cir.1949). But the Supreme Court, by citing *United States v. Silk* as controlling authority in *Enochs v. Williams Packing Co.,* 370 U.S. 1, 3, 82 S.Ct. 1125 [1127], 8 L.Ed.2d 292 (1962), has indicated its agreement with the report of the Senate Finance Committee, the Second Circuit, and Professor Broden that the Congressional amendments were intended as a restatement of the principle of the *Silk, Greyvan* and *Bartels* cases, that the proper

standard is the common law rules "realistically applied."

\* \* \* \* \* \*

Relying chiefly upon *Party Cab Co. v. United States,* Hoosier contends that the sole criterion for distinguishing the employer-employee relationship from others not covered by the definitions is plaintiff's control or right to control the means and method by which the desired result is to be achieved, with other factors considered only as they affect the determination of the question of control in a particular case. While the court in *Party Cab* said that control or right to control is the most important criterion, that factor was not the sole determinant in the decision, as the opinion shows. Justice Rutledge demonstrated in *NLRB v. Hearst Publications, Inc.,* 322 U.S. 111, 120–130, 64 S.Ct. 851 [855–60], 88 L.Ed. 1170 (1944), that there is no single common law test of the employer-employee relationship, which may be applied independently of the purpose for which the classification is made. In defining the term "servant" in connection with tort liability (the most common application of the common-law rules), the American Law Institute lists ten different factors which, "among others," are to be considered.

*Hoosier,* 350 F.2d at 642 (footnotes omitted). The Seventh Circuit in *Hoosier* cites with approval the Restatement (Second), Agency § 220(2), "Definition of Servant." The Restatement states:

In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered: (a) the extent of control which, by the agreement, the master may exercise over the details of the work; (b) whether or not the one employed is engaged in a distinct occupation or business; (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (d) the skill required in the particular occupation; (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (f) the length of time for which the person is employer; (g) the method of payment by the time or by the job; (h) whether or not the work is a part of the regular business of the employer; (i) whether or not the parties believe they are creating the relation of master and servant; and (j) whether the principal is or is not in business."

*Id.* The *Hoosier* court further noted that the determination of the relationship involved is a factual question properly submitted to a jury. The court wrote:

We disagree with Hoosier that the question before the district court was one of law. We think it was one of fact that was properly submitted to the jury. It is not true that because the basic facts are not in dispute an inference of fact is necessarily precluded. It is not difficult to see that the term "employees" embraces a broad range of persons, from those at one end who clearly are employees, e.g., Hoosier's office employees, to those who clearly are not, e.g., a private physician treating the employees. But between these clear cases is a grey area, in which Hoosier's applicators are found, where the trier of fact must be called upon to make the determination. *Service Trucking Co. v. United States,* 347 F.2d 671 (4th Cir.1965). In a situation where the decision is so dependent upon the inferences to be drawn from the facts of each case, the desired uniformity of decision, argued for by Hoosier, can be achieved only by application of the appropriate legal rules, whether by the judge as trier of fact or by the jury under proper instructions.

*Hoosier,* 350 F.2d at 643. The court also noted that the agreement signed by each applicator attempting to create an independent contractor relationship did not control the factual issue. *Id., citing Bartels v. Birmingham,* 332 U.S. at 131–132, 67 S.Ct. at 1550–51.

Where the plaintiff furnished skilled consultants to foreign firms, it was held that the steel consultants under contract with

the plaintiff were independent contractors, and the court stated that "in application of the common law principles the 'right to control' test remains an important index of the relationship, but no one factor is controlling. All of the elements, involved in the employment must be balanced in terms of their significance within the entire employment relationship." *American Consulting Corporation v. United States*, 454 F.2d 473, 477 (3d Cir.1971). The court considered evidence which showed that the plaintiff had no right to control or supervise the consultant's performance in any substantial aspect. The Court stated that "while the Government correctly asserts that the extent of the right to control must be examined in light of the degree of control required by the particular area of work, not even the right to a bare minimum of control over the consultants' work has been demonstrated here." *Id.*, 454 F.2d at 481.

The lack of a right to control was demonstrated by the taxpayer's in *American Consulting* "inability to effect transfers without the individual's consent, notwithstanding a 'transfer provision' in the individual's contract". Other indications of a lack of the right to control was reflected in the lack of instructions from the taxpayer, although on some occasions the taxpayer forwarded suggestions for the resolution of particularly difficult problems. The suggestions were regarded by the consultants as advice which they were free to accept or ignore. *Id.* The Court also found that the plaintiff was not responsible for the defective work of the consultants, and that the plaintiff was powerless to discharge the consultants, factors further indicating a lack of the right to control.

In *Air Terminal Cab, Inc. v. United States*, 478 F.2d 575 (8th Cir.1973), *cert denied* 414 U.S. 909, 94 S.Ct. 228, 38 L.Ed.2d 146, the Circuit Court reversed the District Court's finding that the drivers were independent contractors for the purposes of employee withholding taxes. The Court stated:

> common-law tests are to be used to determine the status of the taxicab drivers. These common-law tests ... provide:

'Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work, but also as to the details and means by which that result is accomplished. That is, an employee is subject not only as to what shall be done, but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work to the individual who performs the services.' Whether the relationship of employer and employee exists will in doubtful cases be determined upon an examination of the particular facts of each case.

*Air Terminal*, 478 F.2d at 579.

In *Air Terminal*, the Court found that there were no supervisory personnel, no offices, no garages, no dispatchers and no radio contact between the drivers and the owners of the cab company. However, the drivers had regular hours, were limited to the airport area for picking up customers, were not allowed to use their cabs for personal use and were required to account for fares and to split those fares evenly between themselves and the company. *Id.*, 478 F.2d at 580. Further, the drivers had no capital investment in the business, were not pursuing any separate trade, business or profession involving a capital outlay and were subject to the general control of the company over the manner and means of performing their services. The company had the right to discharge the drivers for cause, and provided fringe benefits. *Id.*, 478 F.2d at 581.

The Court held that even if actual control was absent from the facts of the individual case, it was the right to control which was dispositive. *Id.* 478 F.2d at 580. *See also*

*Avis Rent A Car System, Inc. v. United States,* 503 F.2d 423 (2d Cir.1974); *McGuire v. United States, supra.* The Sixth Circuit held that where a general measure of control over the manner in which the services of the taxicab drivers are performed, such as operation in a restricted territory, control over the hours worked, and the governing of income to the drivers, the employer-employee relationship exists for the purposes of employment taxes. *Air Terminal,* 478 F.2d at 580.

As noted *supra,* the burden of proving that the alleged employees are actually independent contractors for withholding tax purposes is always on the employer. *Chase Mfg. v. United States,* 446 F.Supp. 698 (E.D.Mo.1978). *Chase* involved a dispute regarding the status of aluminum siding applicators. The court in holding that the individuals were employees for withholding tax purposes, reasoned that the common law test for employer-employee status should be used. *Id.,* 446 F.Supp. at 701. *See also, Enochs v. Williams Packing & Navigation Co.,* 370 U.S. 1, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962). The court in *Chase* listed seven factors that must be considered when analyzing a relationship between an company and its work force. These factors included:

1. If the person receiving the benefit of a service has the right to control the manner in which the service is performed, the person rendering the services may be an employee.

2. If a person rendering a service has a substantial investment in his own tools or equipment, he may be an independent contractor.

3. If a person performing a service undertakes a substantial cost, say be employing and paying his own laborers, he may be an independent contractor.

4. If a person performing a service has an opportunity to profit depending on his management skill, he may be an independent contractor.

5. If a service rendered requires a special skill, the person rendering it may be an independent contractor.

6. If the relationship between a person rendering a service and the person receiving it is permanent, it may be an employment relationship.

7. If a person rendering a service works in the course of the recipient's business, rather than in some ancillary capacity, he may be an employee.

*Chase Mfg.,* 446 F.Supp. at 701, *quoting, Avis Rent A Car Sys. v. United States,* 503 F.2d 423, 429 (2d Cir.1974). The Court in *In re Pearson,* 86 B.R. 179 (Bankr.E.D. Mo.1988) included 3 additional factors to be considered in evaluating a relationship. These additional factors are:

1. Whether or not the principal has the right to discharge the individual.

2. The method of payment (whether by job or by time).

3. Whether the parties believe they are creating an employer-employee relationship or a principal-independent contractor relationship.

*Id.* 86 B.R. at 181. When analyzing a worker's status according to the foregoing factors it is important to remember that no one factor is controlling, although the degree of control exercised is the single most important factor. *Ralls, Inc. v. United States,* 200 Ct.Cl. 240, 470 F.2d 579 (1972); *Barrett .v. Phinney,* 278 F.Supp. 65 (S.D. Tex.1968); *Central New York Insulating Co. v. United States,* 138 F.Supp. 236 (N.D. N.Y.1956).

In defining the relationship between parties in a given situation, the historical approach to case law is of help only insofar as the cases point out the broad general principles which must guide the court in seeking its answer; very rarely are these cases controlling because each case must stand on its own peculiar facts and these differ from case to case. *United States v. Wholesale Oil Co.,* 154 F.2d 745 (10th Cir. 1946). Additionally, even though these factors are vital in determining whether a worker is an employee or an independent contractor, the overall circumstances of the working environment must ultimately be considered. *Ralls,* 470 F.2d at 581; *Morish v. United States,* 214 Ct.Cl. 166, 555 F.2d 794 (1977); *Barrett,* 278 F.Supp. at 71.

Thus, a case will turn on an intensive study of its individual facts; however, an overall view of the situation is imperative in order for the court to refrain from placing an undue emphasis on a limited view of the situation.

The Court in *Pearson* applied these factors in analyzing the circumstances involved and relationship between the company and its workers. In *Pearson* the Company was in the business of remodeling single family residences and constructing room additions. The court noted:

> While all factors are to be considered, the major factor is whether the principal had the right to control the manner and method of performing the work, as well as the result to be accomplished. In the case sub judice Mr. Pearson testified that he directed the work of the laborers and carpenters. They had no diagrams from which to work and required Mr. Pearson's supervision since their function was not self-evident. Their method of performing the work was controlled by Mr. Person. Both the laborers and carpenters were paid on an hourly basis so they had no real opportunity for profit. In addition, there was no evidence that any of the laborers had a substantial investment in their own tools or equipment or that the carpenters undertook a substantial cost (e.g. by the employment of their own laborers or apprentices). Occasionally Mr. Pearson would loan a ladder, power saw or wheelbarrow to these workers.

*Pearson*, 86 B.R. at 181.

As noted by *Texas Carbonate Co. v. Phinney*, 307 F.2d 289 (5th Cir.1962), the resolution of the employer-employee vs. principal-independent contractor issue is to be resolved in favor of an employer-employee relationship in a close case. The court wrote:

> Since the question is one of fact, our function on review is to determine whether there is a substantial basis in the evidence to support the fact determination made by the district court. Although the determination is to be made by common law concepts, a realistic in-

terpretation of the term "employee" is to be adopted, and doubtful questions should be resolved in favor of employment in order to accomplish the remedial purposes of the legislation involved.

*Id.* 307 F.2d at 292. Unless the seven factors strongly suggest that a worker should be classified as an independent contractor, the legislative intent of the tax code thus requires that the individual be classified as an employee with an appropriate withholding liability attaching to the employer.

It is also important to note the perception of the relationship held by the parties through the eyes of the employee-independent contractor. The intent or belief of the worker, employee, or both, is a factor to be considered in determining whether or not the worker is an employee for withholding tax purposes. *American Consulting Corp. v. United States*, 454 F.2d 473 (3d Cir.1971); *Lifetime Siding, Inc v. United States*, 359 F.2d 657 (2d Cir.1966) *cert. denied* 385 U.S. 921, 87 S.Ct. 233, 17 L.Ed.2d 144; *Lanigan Storage & Van Co. v. United States*, 389 F.2d 337 (6th Cir.1968). In close cases, at least one court has determined the status of the workers by relying on the parties' view of the arrangement. *Jackson v. Phinney*, 266 F.Supp. 835 (W.D.Tex.1967).

One court found that a watch repairman working on a commission basis was an employee for withholding tax purposes. *Gensler–Lee, Inc. v. United States*, 70 F.Supp. 675 (N.D.Cal.1946). Free-lance exercise riders and hotwalkers performing services at race tracks for trainers were found to be employees even though their employment was transient and the free-lancers viewed their relationship as that of an independent contractor where the trainer had the right and did in fact exercise control regarding the manner and means by which they performed their services. *McCormick v. United States*, 209 Ct.Cl. 331, 531 F.2d 554 (1976). Individuals who unload trucks are employees of taxpayer even though these individuals were subject to very little supervision by the drivers of the trucking company since the right to

control requires only such supervision as the nature of the work requires. *McGuire v. United States*, 349 F.2d 644 (9th Cir. 1965).

Federal case law is filled with the discussion of the appropriate means of classifying the relationship between individuals as employer/employee or principal/independent contractor. *See Avis Rent A Car System, Inc v. United States*, 503 F.2d 423 (2d Cir.1974) (Car shuttlers engaged by a car rental agency to shuttle cars from one location to another are employees); *Beatty v. Halpin*, 267 F.2d 561 (8th Cir.1959) (Individuals performing custodial or janitorial work for owner of apartment houses who receive in return for their services all or part of their rent are employees for withholding tax purposes); *Westover v. Stockholders Publishing Co.*, 237 F.2d 948 (9th Cir.1956) (Salesman is not excluded from category of employees merely because he is compensated by retaining excess of fixed retail price at which he sells to others over wholesale price); *Investors Heritage Life Ins. Co. v. United States*, 79–1 U.S.Tax Cas. ¶ 9246 (E.D.Ky.1979) (Individual engaged by Life Ins. Co. to establish life insurance mutual fund program is employee of company where individual is furnished with office and secretary at company's headquarters and is paid both salary and commission; such person is subject to control of company and his only opportunity for profit is through the company); *Weatherly v. United States*, 77–2 U.S.Tax Cas. ¶ 9745 (E.D.Pa.1977) (Furniture packers who were engaged, from time to time, by agent of moving company for purpose of packing and crating furniture belonging to company's customers were employees of company); *Smith v. United States*, 72–2 U.S.Tax Cas. ¶ 9522 (E.D.Va.1972) (Barbers whose employer has the right to control their actions, comings, goings and general manner in which their work was to be accomplished were employees); *Moore v. United States*, 68–2 U.S.Tax Cas. ¶ 9661 (E.D.Tex.1968) (auctioneers treated as independent contractors); *Harry D. Morgan Signs, Inc. v. United States*, 67–2 U.S.Tax Cas. ¶ 9742 (D.Or.1967) (Individual engaged to furnish labor as sign painter for corporation engaged in commercial sign painting business is employee of corporation); *Hodgkinson v. Commissioner*, TC Memo 1968–176 (1968) (Babysitters are employees of parents for whom they sit and not independent contractors).

By applying the twenty common law factors described in Rev.Rul. 87–41, 1987–1, C.B. 296, 298–299, to the facts of this case, it is clear that an employer/employee relationship existed between ABS and its workers. ABS president, James Wilson was responsible for developing customers among the retail stores where his workers assembled bicycles and other items. ABS billed the retail stores directly for the work performed and paid the workers based on their productivity. The workers were an essential element of ABS's business. James Wilson directed the customers to contact him with problems. ABS required the workers to sign "Employment Agreement Independent Contractors" (James Wilson Deposition, Transcript P. 24, Deposition Exhibit 4), which contained a non-compete clause. ABS fired workers and its workers had the right to terminate their relationship with ABS at any time. ABS' workers were required to return to the customer's store and correct errors.

John Wilson trained almost all of the workers, and after the initial training ABS paired relatively inexperienced workers with more experienced workers to insure that work was done properly. ABS paid workers for their travel expenses. The capital investment of ABS workers was relatively small, only $300.00, compared to their earning ability with ABS, where a good worker could earn as much as $200.00 in a day. ABS assigned workers to work sites based on James Wilson's perception of who was best suited for a particular assignment. Workers were required to report to the ABS offices each morning to receive assignments, instructions on new products and directions to the work sites.

ABS workers never hired their own assistants. A core group of ABS workers stayed with ABS throughout each season. Workers were required to turn in daily worksheets reporting their activity. The

workers were expected to work full-time, six days a week if necessary. The work was always performed at the customer's retail stores never at the workers' homes. The workers were expected to follow the store manager's directions regarding the order of repairs. ABS' workers had no opportunity for loss or to realize a profit aside from the payments based on the number of assemblies they completed. ABS workers did not advertise or solicit customers. Finally, ABS workers were expected to work only for ABS, and not for the customers directly.

This summary of the facts in the record shows that ABS had the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work, but also as to the details and means by which that result is accomplished. Treasury Regulation Section 31.3401(c)-1. This goes beyond the test set forth in Treasury Regulation Section 31.3401(c)-1 which requires only that the employer possess the right to direct employee's work, because the facts here show that ABS did direct the employee's work as to result and the details and means for accomplishing the result.

One important factor in this case is that ABS required its workers to sign an agreement containing a noncompetition clause. Certainly an independent contractor would not agree to perform his or her services only in connection with ABS assignments, or to refrain from accepting any such assignment from a competitor of ABS for a period of three years after the termination of the agreement. Furthermore, the agreement relied upon to give independent contractor status gives ABS the responsibility to train the worker and has the worker agree to: "comply with the goals, guidelines, directives, position description, policies, and procedures now or at some later date established or approved by A.B. Services."

The agreement was consistent with an employer/employee relationship and not with independent contractor status. That there exists in the agreement self-serving language that attempts to define the relationship between ABS and its workers as one of independent contractors rather than an employment relationship is not controlling. The substance of the agreement, rather than its form, is the material issue. The designations applied by the parties are not controlling. Treasury Regulation Section 31.3401(c)-1(e).

The right of ABS to direct and control its workers was absolute. This is not an instance where ABS may show that there is some legitimate basis for treating its workers as independent contractors, because there is none. ABS had the right to direct and control, and in fact did direct and control the activities of its workers in detail. The facts of this case fit squarely within the common-law test for an employer/employee relationship.

In opposition to the motion for summary judgment ABS has referred this court to the following cases: *United States v. Silk*, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947); *Bartels v. Birmingham*, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947); *Lanigan Storage & Van Co. v. United States*, 389 F.2d 337 (6th Cir.1968); *Lieb v. United States*, 438 F.Supp. 1015 (E.D.Okla. 1977); *Kurio v. United States*, 281 F.Supp. 252 (S.D.Tex.1968); *Bonney Motor Express, Inc., v. United States*, 206 F.Supp. 22 (E.D.Va.1962); *Jobbers Warehouse Co. v. United States*, 78-1 U.S.Tax Cas. ¶ 9359 (D.S.D.1977).

The Supreme Court in *Silk* held that the relationship of the employer-employee should not be determined solely by the control exerted in the relationship, but other factors should also be considered in the context of the total situation. The court found that coal unloaders who provided their own tools, work only when they wish to work and are paid an agreed price per ton to unload coal from railroad cars, were employees for the purposes of withholding taxes. In *Bartels* the Court found that members of "name bands" which play short-term engagements at dance halls are employees of the band leader and not the individual dance hall.

*Jobbers, Lanigan* and *Bonney* involve the characterization of the relationship be-

tween individuals known as "gypsy chasers" and the warehouse or trucking company. The plaintiff argues that there are significant similarities between this way of life and the assemblers in the case *sub judice*. This court will note that the courts in those cases focused on the total situation before them and in their analysis of the situation found that the relationship was one of principal-independent contractor. Admittedly, in some areas the plaintiff may draw limited similarities; however, the balance of this court's analysis of the facts of this case which involves a different: industry, job responsibility, job requirements, job training and employee perception and compels a different result.

The court will note that *Lieb*, cited by ABS, found that the taxpayers telephone solicitors and salaried exterminators were employees and found the employers responsible for withholding tax liability. The court found otherwise for the commissioned exterminators without articulating its reasoning. Yet, from the statement of facts included in the opinion, it is this court's view that the District Court viewed the totality of the circumstances in reaching its conclusion and placed a major emphasis on the right of the company to control those workers.

In *Kurio*, the taxpayer was a contractor who subcontracted drywall work or construction from house and apartment builders. The court found:

> During 1963 and 1964, the opportunity for profit or risk of loss from the operations of the drywall workers and haulers was in their hands alone. They decided whether they would do a job at a price Kurio was willing to pay and, once a job was undertaken, normal business efficiency and the attendant risks involved controlled the success or lack thereof they would experience from the venture. Kurio had no responsibility to the workers and haulers other than to pay the agreed price.

> The drywall workers and haulers were experienced people who, Kurio determined, possessed the ability to perform the work in accordance with the terms of the contract. Kurio did not personally control or direct the manner in which the various jobs were performed, and he had no foremen or supervisors on the job who gave instructions or directions to the workers.

*Kurio*, 281 F.Supp. at 258. This court will note that the independent contractors in *Kurio* were involved in a larger enterprise than ABS's employees. The *Kurio* contractors themselves employed others to complete contracts and took on a clear financial risk, in contrast to the ABS employee who could complete one project in a significantly shorter period of time. This court is not persuaded by this decision that a different result should occur as a result of an application of this decision. It is clear that the entire situation is different.

The Court having reviewed the complaint and answer filed herein and the Defendant's motion for summary judgment together with the supporting memoranda and the Deposition of John Wilson filed on July 11, 1990, and all of the relevant papers and documents of record, and having taken into consideration all admitted facts, the Court finds that no genuine issue of material fact exists pursuant to Fed.R.Civ.P. 56(c) in that the Plaintiff was acting as an employer, rather than contracting with its workers as independent contractors as to the Federal Income Taxes and FICA Taxes due by the Plaintiff to the Defendant, and that the Defendant is entitled to a summary judgment as a matter of law.

It is therefore

ORDERED, ADJUDGED, and DECREED that the Plaintiff was acting as an employer in relationship to its workers, rather than contracting with its workers as independent contractors during the relevant tax periods, and that the Plaintiff has failed to pay and is liable to the Defendant for Federal Employee Income Taxes, Federal Insurance Contributions Act (FICA), and Federal Unemployment Tax Act (FUTA) Taxes for the following tax periods:

1. Fourth quarter of 1986, the second, third, and fourth quarters of 1987, the first, second, third and fourth

quarters of 1988, and the first, second, third, and fourth quarters of 1989 as to Federal Employee Income Taxes and FICA taxes.

2. 1985, 1988, and 1989 as to FUTA Taxes.

The Clerk shall set forth this judgment on a separate document pursuant to Bankr.R. 9021.